**DAVIS, Director General of Railroads, v. AKRON FEED & MILLING CO.**

(Circuit Court of Appeals, Sixth Circuit. March 6, 1924.)

No. 3952.

1. **Estoppel ⬤➝83(3)—Carrier, erroneously stating that part of freight has been paid, estopped from demanding payment of that part.**

Where wheat, which had been reconsigned several times, was sold to defendant f. o. b. cars in defendant's city, and carrier erroneously told defendant that the freight had been paid to a certain point, and defendant paid the freight charges from that point, and paid seller the balance of the purchase price after deducting the freight paid, *held*, that carrier is estopped from demanding further payment of freight by defendant.

2. **Carriers ⬤➝30—Carrier's statement as to amount of freight will not relieve consignee from payment of scheduled rate.**

Representations or claims made by carrier as to the correct amount of the freight charges will not relieve a consignee from payment of the scheduled rate, as a shipper or consignee has equal opportunity with a carrier to know the published rate.

In Error to the District Court of the United States for the Eastern Division, Northern District of Ohio; Paul Jones, Judge.

Action by James C. Davis, Director General of Railroads, against the Akron Feed & Milling Company. Judgment for defendant, dismissing the petition, and plaintiff brings error. Affirmed.

⬤➝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Edward A. Foote, of Cleveland, Ohio (Cook, McGowan, Foote, Bushnell & Lamb and Willard W. Wilson, all of Cleveland, Ohio, on the brief), for plaintiff in error.

Thompson, Hine & Flory, of Cleveland, Ohio, for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

PER CURIAM. In October, 1919, a shipment of wheat originated at Isabel, Kan., and another shipment originated at Pretty Prairie, in the same state. These two shipments of wheat were milled at Hutchinson, Kan., and reshipped by a connecting carrier of the Erie Railroad, under bill of lading dated November 19, 1919, consigned to the order of Larabee Flour Mills, at Kansas City, Kan. It was thereafter reconsigned to E. P. Mueller, at Chicago, and by Mueller was reconsigned to the Akron Feed & Milling Company, Akron, Ohio.

The Akron Feed & Milling Company agreed to pay Mueller for this shipment $1,050 f. o. b. cars at Akron. A bill of lading was forwarded to an Akron bank. When the consignment reached Akron, the Erie Railroad Company represented to the Akron Feed & Milling Company that all freight chargeable against this shipment up to the time of its arrival in Chicago had been paid. The scheduled rate from Chicago, including war tax, amounted to $64.38, of which amount the milling company paid, at the time the bill was presented to it by the railway company, the sum of $53.46, and later paid to the Erie Railroad Company the balance of this freight, amounting to $10.92. The milling company, relying upon the representations made by the railway company that all freight upon this consignment had been paid to Chicago accepted the consignment, paid the freight charges demanded, and then paid to the Akron bank upon the bill of lading the sum of $1,050, less the freight charges of $64.38.

No contention is made that the milling company did not pay the full and correct freight charges upon this shipment, including the war tax, from Chicago to Akron, but the railway company later discovered that the freight charges, amounting, with war tax, to $128.59, from Kansas City to Chicago, had not been paid, and thereupon brought an action against the Akron Feed & Milling Company to recover that sum.

For a defense to this action the milling company claims that it relied, and had a right to rely, upon the representation made to it by the railway company that all freight had been paid upon this shipment to Chicago, where it had purchased this merchandise from E. P. Mueller, and had paid E. P. Mueller in full the agreed price of this merchandise, less the freight from Chicago. It further appears by the stipulation of counsel that:

"Neither the Akron Feed & Milling Company, nor plaintiff, the Erie Railroad, were able to collect this undercharge from the consignor, notwithstanding attempts were made by both plaintiff and defendant."

There is no dispute as to the facts above stated. A jury was waived, and the District Court, upon this agreed statement of facts, entered a judgment for the defendant, dismissing the plaintiff's petition, with costs.

[2] The law is well settled that representations or claims made by the carrier as to the correct amount of freight to be charged will not relieve a consignee from the payment of the scheduled rate, for the reason that a shipper or consignee has equal opportunity with a carrier to know the published rate, and he is conclusively presumed to have such knowledge. Railway Co. v. York & Whitney, 256 U. S. 406, 41 Sup. Ct. 509, 65 L. Ed. 1016. It is apparent that any other construction would defeat the purpose of the act, requiring full and exact payment of the published scheduled tariff upon every shipment of freight, and would afford opportunity for collusion and fraud between the carrier and favored shippers, to the injury and prejudice of the public.

The question here presented, in the absence of any claim or proof of fraud and collusion, must be determined upon wholly different considerations. The consignee in this case had no knowledge, nor had it equal means with the railway company of acquiring knowledge, that the freight from Kansas City to Chicago had not been paid. No circumstance whatever is suggested in the agreed statement of facts that would put the consignee upon inquiry. The railway company knew, or ought to have known, that this freight was not paid, and, when it expressly stated that it had been paid, the consignee relied upon that representation, instead of refusing to accept the consignment until it had made full inquiry with reference to that fact, which inquiry would involve, not only delay, but expense, including demurrage. Nor had the consignee any more reliable source of information than the railway company itself.

The consignee, at the time these representations were made to it, was in position to protect itself fully in the payment of all freight charges. It was wholly a matter of indifference to it whether these charges were $100 or $200. Whatever freight charges it was required to pay it could deduct from the purchase price of the merchandise. It is admitted that, if it is now compelled to pay this freight, it cannot recover the same from the consignor and must suffer the loss. If the matter were one wholly between the carrier and the consignee, there would be no question that the carrier's representation would estop it from demanding further payment of freight. While the statute requiring every shipper and consignee of freight to pay the full published scheduled rate is a salutary one for the protection of the public, nevertheless, in construing and enforcing this statute, courts should not wholly ignore private rights. It is equally important that the rights of private individuals should be protected.

Counsel has not directed our attention to any case in which this exact question has been presented to the Supreme Court, nor does it appear from the investigation we have been able to make that the Supreme Court has held a shipper or consignee of freight liable for the payment of the full published scheduled rate, regardless of misrepresentations by the railway company, upon any theory other than that the shipper and consignee are conclusively presumed to know the published scheduled rate, and therefore may not rely upon the representations made by the carrier. In this case no presumption obtains that the consignee knew that the freight upon this consignment from Kansas City

to Chicago had not been paid. That was not a matter of public knowledge. While the question of legal liability is not free from doubt, the equities are clearly with the consignee, and we are not impressed that the public interest demands such construction of the law as would make the consignee suffer a loss due to the fault, negligence, and misrepresentations of the carrier.

For the reasons stated, the judgment of the District Court is affirmed.