**UNITED STATES of America,**
**Appellant,**

v.

**MASON & DIXON LINES, Inc.,**
**Appellee.**

**No. 12265.**

United States Court of Appeals
Sixth Circuit.

May 25, 1955.

Richard M. Markus, Washington, D. C., Warren E. Burger, Samuel D. Slade and T. S. L. Perlman, Washington, D. C., John C. Crawford, Jr., Knoxville, Tenn., on the brief, for appellant.

Edwin O. Norris, Kingsport, Tenn., Clifford E. Sanders, Jackson C. Raulston, Edwin O. Norris, Kingsport, Tenn., on the brief, for appellee.

Before MARTIN, McALLISTER and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

The United States has appealed from a judgment of the district court awarding the appellee common carrier recovery of freight charges on a consignment to an agency of the United States of a quantity of paint, transported over the motor carrier's lines. The background facts are that a branch of the United States Department of Commerce entered into a contract for the purchase of the paint from Spar-Tex Corporation of New York. The purchase contract stipulated that the paint was to be delivered to the government agency as specified, and the purchase order which was incorporated into the contract provided that the purchase price was to be "f. o. b. destination."

The appellee carrier was aware of the terms of this contract of purchase, including the provision for delivery f. o. b. destination. Three shipments of paint over appellee's lines ensued: two consignments to the government agency at Wilmington, North Carolina; and the third to its agent at Mobile, Alabama. The bills of lading covering all three shipments were forwarded to the consignees, with the word "prepaid" as to shipping charges marked thereon by the carrier. In a letter dated April 29, 1952, mailed to the government agency, appellee stated that the paint had been shipped "on a prepaid basis"; but, as a matter of fact, the freight charges had not been actually paid.

Spar-Tex assigned its rights under the foregoing sales contract to a New York bank, which gave the government agency due notice of the assignment. Pursuant to this notice, the United States Department of Commerce Agency paid the bank the purchase price provided in its contract with Spar-Tex Corporation. After making a fruitless demand upon Spar-Tex for payment of the freight charges, the carrier requested the government agency to withhold from its payment of the purchase price of the paint the amount due the carrier for transporting the goods. But when this request was received, the government agency had already paid the bank. The Spar-Tex Corporation having become insolvent, the common carrier brought this action under the Tucker Act, U.S.C.A., Title 28, section 1346(a) (2), against the United States, seeking recovery of its aforementioned freight charges. It stood upon the proposition that the government, by accepting delivery of the goods as consignee, had become liable for payment of the freight.

Defensively, the government asserted that the carrier was estopped to deny that the freight had been paid, for the reasons that the government agency had accepted the shipments as prepaid upon representation by the carrier to that effect, and that the carrier had knowledge that the agreed purchase price in the contract between the government agency and the consignor included the cost of the freight.

The judgment for the freight charges entered by the district court in favor of the carrier, against the United States, was based upon conclusions of law, stated as follows: "1. Under the provisions of the Interstate Commerce Act, paragraph 7 of Section 6 of Title 49, U.S.C., common carriers are prohibited from granting, by any means, discrimination and undue preferences in freight rates to shippers on shipments in interstate commerce. 2. A consignee who

accepts delivery of goods transported in interstate commerce by common carrier incurs an absolute liability for payment of freight charges. 3. Plaintiff could not under the facts in the case waive or estop itself from collecting the lawful freight rates on the shipments received by defendant." The district court held further that, in an action brought against the United States, no award of interest or costs was allowable.

The statute cited by the district court as determinative, section 6, paragraph (7), of the Interstate Commerce Act, as amended, 49 U.S.C.A. § 6(7), reads: "(7) Transportation without filing and publishing rates forbidden; rebates; privileges. No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs."

The government maintains that the conduct of the carrier in this case was of such character as would give rise to the appropriate application of the doctrine of equitable estoppel, in that the appellee misrepresented to the government agency a material fact, peculiarly within the carrier's knowledge. The government insists that the carrier should have known that the agency would act in reliance on the carrier's representation that the freight had been prepaid; and that, had it known the true situation, the government would have withheld a portion of the purchase price sufficient to cover the shipping charges which were included therein. The government, in its main brief, concedes that, in carrying out the public policy established in paragraph (7) of section 6 of the Interstate Commerce Act, supra, the carrier may hold liable a *private consignee*, as well as the shipper, for the published tariff rates, notwithstanding an agreement to accept a lower rate and despite any circumstances which would ordinarily call for the applicability of the principle of estoppel.

In Pittsburgh, C., C. & St. L. Ry. Co. v. Fink, 250 U.S. 577, 582, 583, 40 S.Ct. 27, 28, 63 L.Ed. 1151, the Supreme Court said that, while it may constitute a hardship upon a consignee who has accepted delivery of the goods shipped and paid all demanded by the carrier as freight at that time to be called upon later to pay an extra sum in order to comply with the tariff rate, "instances of individual hardship cannot change the policy which Congress has embodied in the statute in order to secure uniformity in charges for transportation"; and that "estoppel could not become the means of successfully avoiding the requirement of the Act as to equal rates, in violation of the provisions of the statute." See also Atchison, Topeka & Santa Fe Railway Co. v. United States, 256 U.S. 205, 41 S.Ct. 456, 65 L.Ed. 891; New York Central & Hudson River Railroad Co. v. York and Whitney Company, 256 U.S. 406, 41 S.Ct. 509, 65 L.Ed. 1016; Louisville & N. R. Co. v. Central Iron & Coal Co., 265 U.S. 59, 65, 44 S.Ct. 441, 68 L.Ed. 900.

In its main brief, the government conceded that the doctrine of the foregoing cases extends, in cases of private consignees, to situations where the carrier issues a bill of lading incorrectly marked "prepaid" and delivers the goods on that basis but later discovers its mistake and seeks recovery from the consignee. See Central Warehouse Co. v. Chicago, R. I. & P. Ry. Co., 8 Cir., 20 F.2d 828, 829; Wheaton Brass Works v. Southern Pa-

cific Company, 1951, 341 U.S. 904, 71 S. Ct. 614, 95 L.Ed. 1343, denying certiorari from the Supreme Court of New Jersey, 5 N.J. 594, 76 A.2d 890. See also Great Northern R. Co. v. Hyder, D.C.W.D. Wash., 279 F. 783; Western & Atlantic R. Co. v. Underwood, D.C.N.D.Ga., 281 F. 891; Southern Ry. Co. v. Mayer Myers Paper Co., 191 Tenn. 164, 171, 232 S. W.2d 20. But, in its reply brief, the government states that, in accepting the premise that there can be no estoppel in favor of a *private consignee*, the decision of this court in Davis v. Akron Feed & Milling Co., 6 Cir., 296 F. 675, had been overlooked. In that case, it was held that where the consignee, relying on representations made by the carrier that all freight on the consignment had been paid from Kansas City to Chicago, accepted the goods, paid the freight charges from Chicago to Akron demanded by the carrier, and then paid an Akron bank on the bill of lading the purchase price of the goods shipped f. o. b. cars at Akron, less the freight charges, the railroad company was estopped from demanding payment of the additional freight charges from Kansas City to Chicago which had not been paid and had been overlooked by the railroad company. Judgment was entered against the carrier.

Inasmuch as that decision was published in 1924 by the court of appeals for this circuit and, unless it has been overruled by the Supreme Court or is now overruled by us, is still the law of the circuit, we deem it important to quote at length from the opinion, as follows: "The law is well settled that representations or claims made by the carrier as to the correct amount of freight to be charged will not relieve a consignee from the payment of the scheduled rate, for the reason that a shipper or consignee has equal opportunity with a carrier to know the published rate, and he is conclusively presumed to have such knowledge. New York Central & Hudson River Railway Co. v. York and Whitney Company, 256 U.S. 406, 41 S.Ct. 509, 65 L.Ed. 1016. It is apparent that any other construc-

tion would defeat the purpose of the act, requiring full and exact payment of the published scheduled tariff upon every shipment of freight, and would afford opportunity for collusion and fraud between the carrier and favored shippers, to the injury and prejudice of the public.

"The question here presented, in the absence of any claim or proof of fraud and collusion, must be determined upon wholly different considerations. The consignee in this case had no knowledge, nor had it equal means with the railway company of acquiring knowedge, that the freight from Kansas City to Chicago had not been paid. No circumstance whatever is suggested in the agreed statement of facts that would put the consignee upon inquiry. The railway company knew, or ought to have known, that this freight was not paid, and, when it expressly stated that it had been paid, the consignee relied upon that representation, instead of refusing to accept the consignment until it had made full inquiry with reference to that fact, which inquiry would involve, not only delay, but expense, including demurrage. Nor had the consignee any more reliable source of information than the railway company itself. * * * If the matter were one wholly between the carrier and the consignee, there would be no question that the carrier's representation would estop it from demanding further payment of freight. While the statute requiring every shipper and consignee of freight to pay the full published scheduled rate is a salutary one for the protection of the public, nevertheless, in construing and enforcing this statute, courts should not wholly ignore private rights. It is equally important that the rights of private individuals should be protected.

"Counsel has not directed our attention to any case in which this exact question has been presented to the Supreme Court, nor does it appear from the investigation we have been able to make that the Supreme Court has held a shipper or consignee of freight liable for the payment of the full published scheduled rate, regardless of misrepresentations by

the railway company, upon any theory other than that the shipper and consignee are conclusively presumed to know the published scheduled rate, and therefore may not rely upon the representations made by the carrier. In this case no presumption obtains that the consignee knew that the freight upon this consignment from Kansas City to Chicago had not been paid. That was not a matter of public knowledge. While the question of legal liability is not free from doubt, the equities are clearly with the consignee, and we are not impressed that the public interest demands such construction of the law as would make the consignee suffer a loss due to the fault, negligence, and misrepresentations of the carrier. For the reasons stated, the judgment of the District Court is affirmed."

■ This opinion has been criticized, but we are not convinced that we should depart from the equitable reasoning of our able and distinguished predecessors. Even if we thought otherwise, there would be adequate reasons and authority for reversing the judgment of the district court on different grounds.

In relation to the subject matter, we think the government of the United States stands upon a different footing from that of a private consignee. In the Interstate Commerce Act, as amended, restrictions favorable to the United States are set forth in section 22 of Title 49, U.S.C.A., in the following language: "Nothing in this chapter shall prevent the carriage, storage, or handling of property free or at reduced rates for the United States, State, or municipal governments, or for charitable purposes, or to or from fairs and expositions for exhibition thereat, or the free carriage of destitute and homeless persons transported by charitable societies, and the necessary agents employed in such transportation, or the transportation of persons for the United States Government free or at reduced rates * * *."

There would seem to be no doubt that this section makes permissible transportation agreements between the government and a common carrier under which the government is granted rates more favorable than the published tariff rates.

In Western Pacific R. Co. v. United States, 255 U.S. 349, 356, 41 S.Ct. 332, 333, 65 L.Ed. 671, the carrier contended that, by virtue of the Interstate Commerce Act, it was " 'burdened with the duty and obligation of collecting the full published tariff rate and is powerless to relieve or release a shipper or consignee from any part of the same.' " The Supreme Court thus replied to this argument: "The immediate answer is that section 22 of the Interstate Commerce Act permits reduced rates to the United States, and that by Conference Ruling of the Interstate Commerce Commission No. 33 of February 3, 1908, section 22, is made applicable to property transported for the United States. The transportation in the present case was for the Government, and in providing for it and paying for it the Government performed a governmental service." The Supreme Court held on the same day, March 7, 1921, in Oregon-Washington R. & Nav. Co. v. United States, 255 U.S. 339, 41 S. Ct. 329, 65 L.Ed. 677, which did not involve section 22 of the Interstate Commerce Act, that long-continued concessions by the carrier in transporting property of army officers at less than commercial rates was inconsistent with any intention to reserve its right to more money than it had collected; and that, therefore, it could not recover additional freight charges in the Court of Claims.

The opinion of the Supreme Court in Atchison, Topeka & Santa Fe Railway Co. v. United States, 256 U.S. 205, 41 S.Ct. 456, 65 L.Ed. 891, cited by the appellee, does not in our judgment support its position. There, the government was the shipper—not the consignee—and there were no circumstances upon which the doctrine of estoppel could be grounded. The estoppel found here is based on the action of the carrier in issuing a *prepaid* bill of lading with full knowledge that the government was under contract to pay the shipper for the cost of the freight.

We think that St. Louis, Brownsville & Mexico Railway Co. v. United States, 268 U.S. 169, 175, 45 S.Ct. 472, 474, 69 L.Ed. 899, cited by appellee, is inapposite. There, the Supreme Court asserted that, to constitute acquiescence in payment by the government of a smaller sum than due for transportation charges, something more must be shown than acceptance of the smaller sum without protest; there must have been some conduct of the creditor "akin to abandonment or waiver or from which an estoppel might arise." Mr. Justice Brandeis said further: "Acquiescence can be established by showing conduct before the payment which might have led the government to believe that the amount allowed was all that was claimed, or that such amount, if paid, would be received in full satisfaction of the claim." In the case at bar, the conduct of the carrier clearly led the government to believe that the freight had been prepaid and that it would not be called upon to pay any further freight charges after accepting delivery of the goods.

Appellee argues that under the provisions of section 223 of the Interstate Commerce Act, 49 U.S.C.A. § 323, the shipper or consignor, or the beneficial owner, shall be liable for additional freight charges, irrespective of any provision to the contrary in the bill of lading or in the contract under which the shipment was made. This provision is no more operative against the government's position in this case than are the provisions of paragraph (7), section 6, of the Interstate Commerce Act, as amended, for the reason that by the express provisions of 49 U.S.C.A. § 317(b), the provisions of section 22 are extended to motor carriers.

■ Although the government in its answer conceded jurisdiction of the district court over the subject matter in issue, it now says that the district court did not have jurisdiction under the Tucker Act, 28 U.S.C.A. § 1346(a) (2). The Tucker Act confers upon the district courts, concurrently with the Court of Claims, jurisdiction of actions involving less than $10,000 against the United States, "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." It is, of course, thoroughly established that the question of jurisdiction may be raised at any time during the progress of litigation, and even in the Supreme Court of the United States, *sua sponte*. United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 513, 60 S.Ct. 653, 84 L.Ed. 894; Chicago, B. & Q. Ry. Co. v. Willard, 220 U.S. 413, 419, 31 S.Ct. 460, 55 L.Ed. 521.

The point is made that the complaint declared that the claim upon which this action was brought arose out of "an implied contract" with the United States through one of its agencies; and that it is settled law that the provision of the Tucker Act relating to actions on implied contracts with the United States is limited to contracts implied *in fact* and does not extend to contracts implied *in law*. State of Alabama v. United States, 282 U.S. 502, 506, 51 S.Ct. 225, 75 L.Ed. 492; Merritt v. United States, 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643; Baltimore Mail S. S. Co. v. United States, 4 Cir., 76 F.2d 582. It is contended that the acceptance by the government of the goods consigned to it could, at most, merely constitute an implied obligation to pay the freight charges. We do not base our conclusion upon differentiation between "express" and "implied" contracts but upon altogether different grounds, now to be stated.

■■ The rights and liabilities in an action brought by a common carrier for freight charges on an interstate shipment of goods are governed by the Interstate Commerce Act, which affords the carrier the right to collect its lawful charges. An action against the United States brought by the carrier for such purpose is based upon an Act of Congress. The district courts of the United States are vested with original jurisdic-

tion over any civil action or proceeding arising under any Act of Congress regulating commerce. 28 U.S.C.A. § 1337. The Tucker Act provision for jurisdiction in the district court, as well as in the Court of Claims, over any civil action against the United States not exceeding $10,000 is founded upon an Act of Congress. Inasmuch as the present action arose under a federal statute regulating commerce, the United States District Court was presented with a justiciable controversy over which it was vested with jurisdiction.

The judgment of the district court is reversed, and the action is ordered to be dismissed.