**CONSOLIDATED FREIGHTWAYS CORPORATION OF DELAWARE, Plaintiff-Appellant,**

v.

**ADMIRAL CORPORATION, Defendant-Appellee.**

**No. 18340.**

United States Court of Appeals, Seventh Circuit.

April 27, 1971.

Rehearing Denied May 14, 1971.

Stevens, Circuit Judge, concurred and filed opinion.

Swygert, Chief Judge, dissented and filed opinion.

Francis James Higgins, Edward H. Hickey, John P. Scotellaro, Chicago, Ill., for plaintiff-appellant; Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., of counsel.

George W. Hamman, Robert F. Finke, Chicago, Ill., for defendant-appellee;

Mayer, Brown & Platt, Chicago, Ill., of counsel.

Before SWYGERT, Chief Judge, and CUMMINGS and STEVENS, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff, an interstate motor carrier, sued Admiral Corporation to recover for freight charges. According to the complaint, Admiral was the consignee of goods transported by plaintiff. It was alleged that under Part II of the Interstate Commerce Act (49 U.S.C. § 301 et seq.) Admiral owed plaintiff almost $93,000 for services for the period January 21, 1966, through April 30, 1966.

In its answer, Admiral averred that William A. Rogers was the shipper of these goods under plaintiff's prepaid bills of lading, and that Admiral did not learn that plaintiff was having difficulty in collecting freight charges from Rogers until May 1966. Prior to then, Admiral assertedly had paid Rogers for these and other charges. The answer also alleged that the shipments were under tariffs providing for the charges to be prepaid by the shipper.

According to the evidence, Admiral started to import electrical components and other products from Japan in the early 1960's. These goods were shipped from Japan to western United States ports and were then transported by truck to Admiral's plants in Illinois. In 1963, Admiral retained the services of William A. Rogers for freight and customs clearance. He agreed to advance all necessary charges for inland and ocean freight, to effect proper customs entry into Chicago, and to pay all import duties due. He would then invoice Admiral for these costs and for his services.

When the goods reached Seattle or San Francisco, Admiral would notify Rogers. He would choose the motor carrier to transport the goods to Chicago, and that carrier would advance payment for the ocean freight charges and later include them in its inland freight invoice to Rogers.

Commencing in September 1965, Rogers selected plaintiff as the motor carrier to transport Admiral's import freight. The goods moved on plaintiff's bills of lading which showed Admiral as the consignee and Rogers as the shipper and party to be billed. The bills of lading were also marked by Rogers as "prepaid" or "to be prepaid," meaning that Rogers, the shipper, was to be billed by plaintiff and pay its charges.[1]

After delivery of the goods to Admiral, plaintiff billed Rogers for the inland and ocean freight charges through invoices stating that under Interstate Commerce Commission regulations payment was required within 7 days of delivery. Prior to April 1966, Rogers often failed to make payment of plaintiff's invoices within that time limit, but plaintiff did not enforce the provision.

The record contains no indication that Admiral had authorized Rogers to obtain credit from plaintiff or that Admiral was aware that Rogers was obtaining such credit beyond the permissible period. Rather, Rogers sent Admiral his own invoices which were paid in full and without question. Admiral did not learn of Rogers' delinquencies until notified by plaintiff during the first week of May 1966. At that time Admiral changed its payment practices to insure that plaintiff would be paid for such future charges. Rogers ultimately went out of business in November 1966.

Plaintiff unsuccessfully attempted to recover these freight charges from Rogers as consignor. In early 1968, plaintiff demanded that Admiral undertake payment. When it refused, plaintiff brought this suit against Admiral on the

---

1. The testimony showed that "prepared" meant paid in advance by the shipper or to be billed to the shipper. After Rogers became affiliated with Intercontinental Transport Company early in 1966, some of the bills of lading showed that the shipper was "Intercontinental for Wm. A. Rogers," but Rogers was shown as the party to be billed.

theory that it was liable for the shipping charges as consignee.

The district court granted judgment for Admiral at the close of plaintiff's case. The court concluded: (1) plaintiff had not shown Rogers' inability to pay the freight charges; (2) he was a freight forwarder under Part IV of the Interstate Commerce Act, so that Admiral's payments to him discharged any obligations to plaintiff imposed upon Admiral by the Act; and (3) plaintiff was estopped to proceed against Admiral on these shipments.

## I

Admiral does not contend that the provision for prepayment by Rogers altered the contractual terms of the bills of lading and relieved it, as consignee, from any obligation of payment of the freight charges. Instead, Admiral urges that notwithstanding any such liability, plaintiff is estopped to collect the freight charges in this case.

In Missouri Pacific RR. Co. v. National Milling Co., 276 F.Supp. 367 (D.N.J. 1967), affirmed, 409 F.2d 882 (3d Cir. 1969), the principles of estoppel were applied to bar a carrier from imposing a double payment upon a consignee that accepted delivery of a shipment under a uniform straight bill of lading marked "freight prepaid" and then reimbursed the consignor for the full amount of freight charges in accordance with their separate agreement. By marking the bills of lading "prepaid," the carrier was held to have represented satisfaction of its freight charges upon which the consignee reasonably relied in paying the same amount to the consignor. See also Davis v. Akron Feed & Milling Co., 296 F. 675 (6th Cir. 1924), reaffirmed in United States v. Mason & Dixon Line, Inc., 222 F.2d 646, 647–650 (6th Cir. 1955).

■ We find the principles enunciated in those cases applicable to the instant controversy. Here the delivery receipts of the waybills showed William A. Rogers as the party to be billed. The

delivery receipts of the "Weight and Charges Ahead Bills" indicated that the "Revenue Bill is Prepaid." The "Memorandum" for each shipment acknowledging the issuance of a bill of lading also bore a stamped statement that the freight charges were "Prepaid—Bill W. A. Rogers." Admiral accepted delivery of the shipments upon those representations and promptly paid Rogers' invoices for the freight charges. These representations thus deprived Admiral of its ability to protect itself from possible double liability by paying the freight charges itself directly to the carrier upon acceptance of the shipment. Having indicated upon delivery that payment was sought and received from Rogers, plaintiff invited Admiral to discharge its obligations under its agreement with Rogers. Equity will not ignore plaintiff's participation in securing Admiral's detrimental reliance in supposedly reimbursing Rogers for freight bills already paid.

Plaintiff objects that Admiral may not assert estoppel since it did not in fact rely upon any representation of prepayment when it accepted delivery and then satisfied Rogers' invoices. We find this contention factually unsupported in the record. There was no evidence that Admiral was actually aware of the falsity of those representations, either at the time of delivery or subsequently when it paid Rogers. Admiral's action after receiving notification of Rogers' delinquencies strongly supports the contrary inference. Nor does Admiral's apparent awareness that Rogers engaged in credit transactions with various shippers indicate that Admiral knew the true basis upon which the instant shipments were handled. Rogers dealt with other carriers and other companies. We decline to charge defendant with knowledge of falsity.

■ Plaintiff also urges that Admiral acted improperly in settling Rogers' invoices without demanding receipts from Rogers evidencing actual payment of the charges to the carrier. In that manner, it is claimed, Admiral could

have prevented any fraud by Rogers and protected itself against possible double liability for those charges. Plaintiff ignores, however, the weight which Admiral could justifiably attach to the representations made on the shipping documents. We see no reason, however, for a double check by Admiral in the face of the representations of prepayment supplied by the carrier itself. Plaintiff could have indicated on those documents the exact nature of its credit transactions with Rogers. Its extensions of credit to Rogers neither involved nor benefited the unsuspecting consignee. Plaintiff may not now shift the risk of its own credit transactions to an innocent party acting in reliance upon plaintiff's incorrect representations of prepayment.

■ The present controversy offers additional grounds for intervention of the principles of equity. Plaintiff's transactions with Rogers involved credit extensions well beyond the seven-day limit imposed upon such transactions by the Interstate Commerce Commission.[2] Through its unlawful and lax credit extensions, plaintiff contributed substantially to its ultimate inability to recover payment from that shipper. These practices also increased the amount of loss which resulted from Rogers' financial failure. Plaintiff continued shipping

goods for Rogers on credit and did not deign to notify Admiral, from whom it now seeks recompense, until well after a reasonable time had elapsed.

Plaintiff thus created the risk of loss by its credit practices. It contributed to the gravity of the loss by allowing Rogers' unsatisfied debts to accumulate beyond the lawful and reasonable time for credit. Finally, it effectively prevented Admiral from protecting itself from Rogers' conversions, first through the misrepresentations of prepayment, and then through its failure to notify Admiral until May 1966. Under these circumstances, we find no difficulty in holding plaintiff estopped to collect payment of the freight charges from Admiral.

## II

In order to avoid estoppel as to its claim, plaintiff raises two additional contentions. First, it strenuously urges that Section 223 of the Motor Carrier Act (49 U.S.C. § 323) imposes absolute statutory liability upon the consignee and that its policies may not be defeated by equitable principles. Second, it asserts that Admiral's payment to Rogers failed to discharge Admiral's liability to plaintiff on the ground that Rogers was merely Admiral's agent.

2. Pursuant to the powers delegated by Congress under Section 223, the Interstate Commerce Commission enacted regulations governing credit extensions by motor carriers, billing practices, and payments of bills for freight charges. 9 C.F.R. § 1322.1 contains the Commission's limitations on credit extended by motor carriers:

"Upon taking precautions deemed by them to be sufficient to assure payment of the tariff charges within the credit period herein specified, common carriers by motor vehicle may relinquish possession of freight in advance of the payment of the tariff charges thereon and may extend credit in the amount of such charges to those who undertake to pay them, such persons herein being called shippers, for a period of 7 days excluding Saturdays, Sundays, and legal holidays. When the freight bill cov-

ing a shipment is presented to the shipper on or before the date of delivery, the credit period shall run from the first 12 o'clock midnight following delivery of the freight. When the freight bill is not presented to the shipper on or before the date of delivery, the credit period shall run from the first 12 o'clock midnight following the presentation of the freight bill. In regard to traffic of nonprofit shippers' associations and shippers' agents, within the meaning of section 402(c) of part IV of the Interstate Commerce Act, the carriers shall require such organizations to furnish the names of the beneficial owners of the property in the bills of lading or at least have the bills of lading incorporate by reference a document containing the names of the beneficial owners."

A. Section 223 does not bar application of estoppel in this case.

We discern nothing in the language or policies of Section 223 to suggest that Congress intended to impose absolute liability upon a consignee for freight charges. Nor do we believe that the application of equitable estoppel against plaintiff's claim circumvents the policies of that Section.

In addition to direct agency regulation of carrier charges and tariff rates, civil actions, and criminal penalties, Congress enacted Section 223 of the Motor Carrier Act in 1935 to curb prejudicial or preferential discrimination among shippers by interstate motor carriers.[3] Like the 1920 Transportation Act pertaining to railroad carriers from which it was derived,[4] this Section attacks discriminatory handling of rate collection and credit practices by requiring prompt and uniform collection of full tariff rates and charges. It provides in pertinent part:

"No common carrier by motor vehicle shall deliver or relinquish possession at destination of any freight transported by it in interstate or foreign commerce until all tariff rates and charges thereon have been paid, except under such rules and regulations as the Commission may from time to time prescribe to govern the settlement of all such rates and charges, including rules and regulations for weekly or monthly settlement, and to prevent unjust discrimi-

nation or undue preference or prejudice: * * *." 49 U.S.C. § 323.[5] Congress was concerned with eliminating rate and credit discrimination in the collection of the lawful charges from the party otherwise liable, whether it be the consignor, consignee, or another shipper with a beneficial interest in the goods shipped. The statute is not primarily addressed to establishing or locating liability ·for payment of freight charges. No attempt was made to specify from whom payment should be collected under ordinary circumstances.

The relationship between Section 223 and the definition of liability under contract and common law is evident in Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Fink, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151, and Louisville & Nashville R. R. Co. v. Central Iron & Coal Co., 265 U.S. 59, 44 S.Ct. 441, 68 L.Ed. 900, relied upon by plaintiff. In each case, the Court ascertained the existence of the party's liability for freight charges apart from consideration of the statutory requirements for collection of the full tariff rate.

In *Fink*, the carrier undercharged the consignee at the time of delivery of a shipment of goods and subsequently sued him for the unpaid balance of the lawful tariff rate. Despite the apparent absence of an agreement with the consignor under the bill of lading imposing liability upon Fink, the Court determined that acceptance of delivery rendered the consignee *prima facie* liable for charges at common law. The Court

---

3. Section 216(d) (49 U.S.C. § 316(d)) states the general prohibition against making, causing or giving "any undue or unreasonable preference or advantage" to any shipper by an interstate motor vehicle carrier. In order to enforce this policy, Congress empowered the Interstate Commerce Commission to adjust unlawful rates and charges, 49 U.S.C. § 316 (e), (f). Congress also required published tariffs stating applicable rates, thus insuring uniformity of charges and permitting parties liable for payment to check the legality of the payment demanded. 49 U.S.C. § 317. In addition to agency intervention, Congress also created crim-

inal penalties for discriminatory conduct, and authorized civil actions for redress in federal courts. 49 U.S.C. § 322.

4. 49 U.S.C. § 3(2); see also Shipping Act of 1916, 46 U.S.C. §§ 812, 814–817.

5. The remainder of the Section excepts credit extensions favoring the United States Government and its political subdivisions, and provides special rules governing liability in cases of agency by the consignee on behalf of another where additional transportation charges are necessary. These provisions are inapplicable to the instant controversy.

then held that in light of Section 6 of the Act to Regulate Commerce (49 U.S. C. § 6(7)), the extent of the consignee's liability must be deemed to be the full sum fixed by the tariff, whether or not the full charges were demanded prior to the carrier's relinquishment of the goods:

"The transaction, in the light of the act, amounted to an assumption on the part of Fink to pay the only legal rate the carrier had the right to charge or the consignee the right to pay." 250 U.S. at p. 582, 40 S.Ct. at p. 28.

The distinction between the imposition of liability for freight charges and the impact of the statutory prohibition against discrimination by carriers is even more apparent in *Central Iron.* The Court there looked to the contractual terms stated in the bills of lading to determine whether the consignor-defendant was liable for the uncollected balance of the required tariff. The bills of lading expressly placed primary responsibility for payment of freight charges upon the consignee. The Court stated that although the shipper ordinarily assumes the obligation to pay such charges, the bills of lading could alter the shipper's obligation to provide only secondary liability or no liability whatsoever for freight charges. Finally, the Court held that,

"if a secondary obligation of the Central Company was to be implied from the fact of its causing the coke to be received for transportation, the promise was not necessarily one to pay at any time any freight charges which the carrier might find it impossible to collect from the consignee or his assign. The court might have concluded that it guaranteed merely that the consignee or his assign would accept the shipment. For under the rule of the *Fink Case,* if a shipment is accepted, the consignee becomes liable, as a matter of law, for the full amount of the freight charges, whether they are demanded at the time of delivery, or not until later. *His liability satisfies*

*the requirements of the Interstate Commerce Act."* 265 U.S. at pp. 69–70, 44 S.Ct. at pp. 443–444 (emphasis supplied).

The undercharge cases are thus consistent with and, indeed, support our conclusion that Section 223 was not intended to fasten a rigid liability upon a consignee. Congress left the initial determination of a party's liability for freight charges to express contractual agreement or implication of law. Cf. Illinois Steel Co. v. Baltimore & Ohio R. R. Co., 320 U.S. 508, 64 S.Ct. 322, 88 L. Ed. 259. So long as payment of the full tariff charges may be demanded from some party, the anti-discrimination policy of the Section is satisfied. Congress did not undertake to settle all issues of collection with the enactment of Section 223. Nor did Congress intend to fashion a sword to insure collection in every instance and a shield to insulate the carrier from the legal consequences of otherwise negligent or inequitable conduct.

These same considerations lead us to reject plaintiff's claim that the principles of equitable estoppel have no application in any action for the collection of freight charges. Plaintiff relies on the holding in Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Fink, 250 U.S. 577, 582–583, 40 S.Ct. 27, 28, 63 L.Ed. 1151, that the defendant could not interpose the doctrine of estoppel to bar recovery of the balance of the lawfully required freight rate since

"[e]stoppel could not become the means of successfully avoiding the requirement of the Act as to equal rates, in violation of the provisions of the statute."

That holding of course must be considered in the context of the facts of that case. The crucial question is not whether estoppel is urged as a bar to collection of the tariff rate as such, but whether the use of estoppel to prevent recovery on the facts of the particular case contradicts the statutory policy of Section 223 to curb discriminatory treatment of shippers.

■ In this case, there is no discernible conflict between the application of equitable principles to bar the carrier's recovery and the statutory proscription against discriminatory treatment of shippers. Requiring double payment of the charge by Admiral would not further the statutory policy of preventing "unjust discrimination or undue preference." As Judge Cohen perceptibly observed in Missouri Pacific RR. Co. v. National Milling Co., 276 F.Supp. 367, 372 (D.N.J.1967), affirmed, 409 F.2d 882 (3d Cir. 1969):

> "the defendant consignee here, even considered as an agent or trustee for the public interest, has discharged in full measure its obligation to pay its debt as required by law. The *Act* does not make him an insurer of the carrier's business. * * * It was not the intention of Congress to overturn the law of concomitant equities of transportation contracts and arrangements; rather, the genius of the *Act* was the abolition of preferential treatment of shippers despite any guise, intention, or accident resulting in or designed to defeat this legislative objective of uniform rates. When the *Act* is focused upon the circumstances of this case, no preferential treatment, intentional, collusive, coincidental, or otherwise, appears to have been secured by the defendant consignee." See also Davis v. Akron Feed & Milling Co., 296 F. 675 (6th Cir. 1924).

In *Fink*, the application of estoppel would have led to the unconscionable result of permitting the party liable for full tariff charges to retain the benefits of the unlawful undercharge even though, as a matter of law, he was held to have knowledge of the correct rates. Unlike *Fink* and the other undercharge cases, estoppel here would involve no such judicial sanction of a preferential discrimination in the face of the carrier's attempt to comply with the Act. Admiral does not seek to employ equity to defeat the statute or shift its payment obligations to another while retaining unlawful benefits. The full rate was charged. The only unlawful discrimination was the plaintiff's extension of credit to Rogers. The preferential practices indulged in here are not susceptible to retroactive correction as is the case with an unlawful undercharge. Plaintiff's conduct benefited none but Rogers, and Admiral's payment of the full tariff rate removes any possible contention of preferential advantage.

In considering Admiral's plea for equitable relief, this Court should not blind itself to plaintiff's unlawful conduct in violating the credit regulations enacted by the Commission under Section 223. Admiral cannot be charged as a matter of law with knowledge of the preference. Cf. Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Fink, 250 U.S. 577, 581, 40 S.Ct. 27, 63 L.Ed. 1151. Permitting recovery in this case would serve only to reward the carrier for its unlawful as well as inequitable conduct. We decline to turn Section 223 inside out to achieve that anomalous result.

**B. Rogers was not merely Admiral's agent.**

■ Finally, plaintiff seeks to avoid the district court's judgment on the ground that Rogers was simply Admiral's agent and that payment to him did not discharge Admiral's underlying liability. Our review of the record, however, persuades us that the district court was correct in finding Rogers to be an independent customs broker rather than an agent of Admiral. Rogers performed the same or similar services for other customers as he did for Admiral. He selected the carrier and made all preparations for shipment, including preparation of the bills of lading. Admiral exercised no control over his business methods and reimbursed him on the basis of shipments received. Cf. Farrell Lines Incorporated v. Titan Industrial Corporation, 306 F.Supp. 1348 (S.D.N.Y.1969). Whether Rogers was licensed as a freight forwarder under the Interstate Commerce Act (49 U.S.C. §§ 1003,

1010), and whether he performed such forwarding services in all respects for Admiral are irrelevant considerations.[6]

The judgment is affirmed.

SWYGERT, Chief Judge (dissenting).

My reading of section 223 of the Motor Carrier Act, 49 U.S.C. § 323, and the cases decided under it and under 49 U.S.C. § 3(2), the counterpart statute pertaining to railroad carriers, makes Admiral as the consignee liable for the freight charges which Rogers failed to pay. This liability is clearly stated in the bill of lading under which the shipments were transported, the pertinent part reading: "The owner or consignee shall pay the freight and average, if any, and all other lawful charges accruing on said property. * * *" Only if he is an agent with no beneficial interest in the property which was shipped and has notified the carrier of that fact may a consignee avoid his liability for payment of the freight charges.

Pittsburgh, C. C. & St. L. Ry. v. Fink, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151 (1919), established that the policy of the Interstate Commerce Act demands that the carrier receive full payment in every case. To effectuate that policy, *Fink* established the rule that regardless of contract and equitable principles, a consignee who accepts delivery cannot avoid liability for freight charges. Unlike the majority, I believe that *Fink*, and the legion of cases following it, do "suggest that Congress intended to impose absolute liability upon a consignee." As Mr. Justice Brandeis stated in Louisville & N. R. R. v. Central Iron & Coal Co., 265 U.S. 59, 70, 44 S.Ct. 441, 444, 68 L.Ed. 900 (1924):

> [I]f a shipment is accepted, the consignee becomes liable, as a matter of law, for the full amount of the freight charges, whether they are demanded at the time of delivery, or not until later. His liability satisfies the requirements of the Interstate Commerce Act.

The liability of the consignee is statutory. It is irrelevant that the consignee may have demanded that the consignor agree to pay freight charges, or that the bill of lading provided that the freight was to be paid by the consignor. If the consignor, for whatever reason, fails to pay the charges, the carrier may proceed directly against the consignee. Boston & Me. R. R. v. Hannaford Bros., 144 Me. 306, 68 A.2d 1 (1949); Central Warehouse Co. v. Chicago, R. I. & P. Ry., 20 F.2d 828 (8th Cir. 1927); *see* Southern Railway System v. Leyden Shipping Corp., 290 F.Supp. 742, 744 (S.D.N.Y. 1968).

A consignee who has accepted delivery of goods cannot raise the defense of estoppel to avoid his statutory duty to pay the freight charges. "Estoppel could not become the means of successfully avoiding the requirement of the act as to equal rates, in violation of the provisions of the statute." *Fink, supra* at 583, 40 S.Ct. at 28. Mr. Justice Brandeis reiterated this principle in *Central Iron, supra* at 65, 44 S.Ct. at 442:

> No contract of the carrier could reduce the amount legally payable; or release from liability a shipper who had assumed an obligation to pay the charges. Nor could any act or omission of the carrier (except the running of the statute of limitations) estop or preclude it from enforcing payment of the full amount by a person liable therefor.

The majority rules that the carrier's illegal action in extending credit for a period in excess of the seven-day maximum provided by the regulations under section 323 prevents its recovering any freight charges. Permitting this defense allows consignees to assert a species of estoppel against carriers. I believe *Fink* intended to preclude this possibility. In that case, the Supreme Court recognized that the carrier's ac-

---

6. In light of our holding on estoppel, we need not consider plaintiff's contentions concerning Rogers' inability to pay.

tion in failing to collect the entire freight charge before it released the goods was a violation of the Act; but the Court did not allow this illegal action by the carrier to be used by the consignee as a means of avoiding his statutory obligation to pay the full freight charge.

I believe the correct rule was stated in East Texas Motor Freight Lines v. Franklin County Distilling Co., 184 S. W.2d 505, 507 (Tex.Civ.App.1944):

> The consignor of freight under bill of lading, such as is here in question, failing to sign the nonrecourse provision, is liable for the legitimate freight charges on the shipment. This is true, even though the carrier makes delivery in violation of Section 323 of Title 49, U.S.C.A., and violates the Rules of the Commission as to extending credit to the consignee.

\* \* \*

Nothing in the Motor Carrier Act provides that a carrier's failure to comply with section 323 or the Interstate Commerce Commission's credit regulation should result in the carrier's forfeiting its right to collect freight charges. Indeed, the conclusion that a violation of the credit regulation results in a forfeiture appears to be inconsistent with the Act's policy of assuring that no consignee can avoid the ultimate responsibility for paying the full freight charges provided for in the carrier's tariff. A consignee is always primarily liable to the carrier regardless of any contractual liability of others.

I would reverse.

STEVENS, Circuit Judge (concurring).

The petition for rehearing prompts me to add an additional word further explaining my agreement with Judge Cummings.

A primary purpose of the Interstate Commerce Act as originally enacted in 1887 was to protect shippers, consignees and consumers from what was feared to be undue monopolistic power of certain carriers.[1] In time the primary purpose of the legislation was converted into the protection of carriers from competition among themselves and from other forms of transportation.[2] In this case a carrier seeks to extend the protective policy of the statute in order to be held harmless from credit losses resulting directly from its own flagrant disregard of regulations promulgated under the statute. To accomplish this noble end it would require an innocent consignee to defray freight costs exactly double the amount contemplated by the applicable tariffs. As Judge Cummings' opinion demonstrates, the cases on which appellant relies do not remotely justify any such perverse result.

---

1. 24 Stat. 379 et seq.; see Huntington, "The Marasmus of the I.C.C.: The Commission, the Railroads and the Public Interest," 61 Yale L.J. 467, 470–71 (1952).

2. See Transportation Act of 1920, 41 Stat. 456 et seq.; Motor Carrier Act, 1935, 49 Stat. 543 et seq.; Reed-Bulwinkle Act of 1948, 62 Stat. 472 et seq.