Canavan, J.
This is an action for services rendered in which the plaintiff, Consolidated Rail Corporation, (hereinafter called Conrail), an interstate common carrier, seeks to recover from the defendant, Hallamore Motor Transportation, Inc., (hereinafter called Hallamore), an interstate common carrier, freight charges in the amount of $9,118.57 for the transhipment of cranes and crane components in February, 1979. Conrail claims that Hallamore is liable for the charges because Hallamore is listed as consignee on certain waybills for said transhipments.
Hallamore answers admitting that it was designated as consignee on the waybills, but denies that it was the actual consignee. Further answering, Hallamore states that Conrail is not entitled to recover damages in any amount, by reason of estoppel, waiver and the failure of consideration. At the trial, Conrail and Hallamore each moved for judgment upon an Agreed Statement of Facts, as a “case stated.” The court found for Conrail in the sum of $9,118.57.
Conrail and Hallamore stipulated that the facts in this case are as follows:
(1) The plaintiff, Consolidated Rail Corporation (hereinafter sometimes called “Conrail”), is a common carrier engaged in interstate commerce.
(2) The defendant, Hallamore Motor Transportation, Inc., (hereinafter sometimes called “Hallamore”), is a motor common carrier engaged in interstate commerce.
(3) The accounts sought in this action arose out of transactions engaged in interstate commerce.
(4) The Waybills attached hereto [the Report] as Exhibits E and F, Nos. 1617 and 1721, respectively, reflect the cargo that was shipped by Conrail and which was subsequently transhipped by Hallamore to Eastern Steel Services, Inc., Quonset Point, Rhode Island. (See App. “A” and App. ‘B” attached to this opinion.)
(5) The Bills of Lading attached hereto [the Report] as Exhibits G and H were issued for the cargo on February 21 and February 27,1979, respectively. (See App. “A" and “B” attached to this opinion.)
(6) The amount claimed under the two waybills complained of is $4,544.76 and $4,573.82, respectively. (See App. “A” and App. “B” attached to this opinion.)
(7) Hallamore did not see or receive any copies of the Bills of Lading or the Waybills numbered 1617 and 1721 until this action was commenced.
*128 (8) Those T3ills of Lading and Waybills reflect that Hallamore was named as the consignee on each of them. However, Hallamore was named as consignee without its authorization and without its knowledge, Hallamore having had no contract or communications with Conrail concerning the Bills of Lading and Waybills until after its unloading the cargo from the railroad cars and its transhipment of same to Quonset Point, Rhode Island, and after Conrail sought payment for the same several months later.
(9) The Bills of Lading and Waybills each state on their face that freight bills are to be sent to Davis Machinery Company and that the cargo was consigned to Hallamore for transhipment to Eastern Steel Services, Inc., c/o General Dynamics, Quonset Point, Rhode Island.
(10) The bills of lading state ‘The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.”
(11) To Conrail’s knowledge, Hallamore was listed as consignee on the above-mentioned waybills by a person or entity other than Hallamore or Conrail.
(12) Hallamore unloaded the cargo which is the subject of the above-mentioned waybills from Conrail’s railroad cars and transhipped it to Quonset Point, Rhode island.
(13) Conrail has demanded that Hallamore pay the amounts requested in the waybills as stated above, but Hallamore has refused to pay such sums.
(14) The amounts claimed under the above-mentioned Waybills are according to tariff number TEA-FT-2010-J., Supplement 102, Item 61980-B, Part 3 issued by the Interstate Commerce Commission as in effect at the time of the transport. The rate is in supplement 122 under Commodity Rate Column 2098.
(15) Prior to delivery of the cargo to Hallamore, Conrail had received and was aware of the contents of the Bills of Lading and Waybills.
(16) Hallamore did not have beneficial title to the cargo and was acting as an agent for the sole purpose of transhipping the cargo to Eastern Steel Services, Inc., Quonset Point, Rhode Island..
(17) W.E. Thompson, Conrail’s Field Terminal Supervisor at the Worcester Yard, was aware of the facts in the foregoing paragraph 16.
(18) Without Hallamore conceding that such is necessary, Hallamore admits that it did not give Conrail written notice of its lack of beneficial ownership of the cargo prior to unloading it.
(19) Prior to commencing its action against Hallamore, Conrail made demand upon Davis Machinery Company, FMC., Corp. and Oxhandler Structural Enterprises, Inc., for payment of the freight charges at issue herein. Conrail had not commenced suit against any of the above-named entities.
(20) Conrail did not request payment at the time Hallamore unloaded the cargo.
(21) After unloading the cargo, Hallamore delivered it to Eastern Steel Services at Quonset Point, Rhode Island.
(22) Conrail has not been paid for the freight charges which are the subject of this action by anyone.
(23) Except for any relationship between Conrail and Hallamore which may arise by operation of law based upon the facts stated herein, there was otherwise no contractual relationship between Conrail and Hallamore with respect to this transaction.
The court found for Conrail in the sum of $9,118.57.
The sole issue in this case is whether the trial court erred in finding the *129 defendant liable for freight charges to the plaintiff. Hallamore contends that since it was not the owner of the crane components and that it did not agree to be the consignee, it is not responsible for the payment of the tariff charges. We find no error.
The principle purpose of 49 USCS, sec, 10744,[1] as well as the entire Interstate Commerce Act, unquestionably, was to eliminate all forms of rate discrimination on interstate shipments. Roll Form Products, Inc. v. All State Trucking Co., 662 F.2d 150 (1981); Southern Pacific Transportation Co. v. Campbell Soup. Co., 455 F.2d 1220 (1972). The act was not intended to ‘Tashion a sword” to insure collection by carriers of freight charges, nor do we think the act was intended to impose an absolute liability upon consignee for freight charges. Its sole purpose was to “secure quality of rates to all and to destroy favoritism.” Roll Form Products, Inc. v. All State Trucking, Inc., supra.
Accordingly, in the absence of discriminatory practices, “Congress left the initial determination of a party’s liability for freight charges to express contractual agreement or implication of law.” Consolidated Freightways Corp. v. Admiral Corp., 442 F.2d 56, 62 (1971).
Of course, where the parties fail to agree, or where discriminatory practices are present, the Interstate Commerce Act will bind the consignee to pay freight charges to the carrier on goods he accepts, this obligation being independent ofthe consignor’s own obligations. Roll Form Products, Inc. v. All State Trucking Co., supra.
We find no evidence in the record of discrimination practice and, therefore, the parties to this action were free to allocate freight charges by contract, as they wished, unaffected by 49 U.S.C.S. § 10744 of the Interstate Commerce Act. The trial judge was warranted in finding that there was no agreement by Hallamore to pay the freight charges because paragraph 23 of the stipulated facts states, “Except for any relationship between Conrail and Hallamore which may arise by operation of law based on the facts herein, there was otherwise no contractual relationship between Conrail and Hallamore with respect to this transaction.”
The only reference to freight charges appears in paragraph (9) of the stipulated facts where it says, “The bills of lading and waybills each state on their face that freight bills are to be sent to Davis Machinery Company.” There is no evidence in the record as to who Davis Machinery Company is, or that it *130 agreed to become contractually obligated for the freight bill. The record does indicate that prior to commencing its action against Hallamore, Conrail made demand upon Davis Machiney Company, F.M.C. Corp. and Oxhandler Structural Enterprises, Inc. for payment of the freight charges in issue herein and that Conrail had not commenced suit against any of the above named entities.
The trial court was warranted in finding an absence of an agreement by the parties to pay for freight charges and thereby resorted to 49 USCA § 10744 to bind the consignee Hallamore to pay the freight charges to Conrail on goods that it accepted and took away.[2]
The law pertaining to the payment of freight charges by a common carrier engaged in interstate commerce has long been settled. Once a party who is named as consignee on a waybill receives the cargo that has been transported by common carrier) that party is responsible for the payment of the freight charges. The consignee is entitled to merchandise only upon payment of transportation charges, and once the merchandise is taken, the obligation to pay is vested. Pittsburg, Cincinnati, Chicago and St. Louis R. Co. v. Fink, 250 U.S. 577, 40 S. Ct. 27 (1919).
When goods are shipped interstate by common carrier, the freight rate is determined by the tariff filed with the Interstate Commerce Commission. The legal amount of the freight charges owed to the common carrier is then deducted through the application of the tariff rate to the actual weight of the goods shipped. In this manner, freight costs are set by law; therefore, no contract nor any act short of running of the statute of limitations can prevent the carrier from enforcing the freight services rendered. Louisville & Nashville Railroad Company v. Central Iron & Coal Company, 265 U.S. 59, 65 (1923); Southern Pacific Transportation Company v. Commercial Metals, 102 S. Ct. 1815-1820 (1982).
If a shipment is accepted, the consignee becomes liable for freight charges, whether they are demanded at the time of delivery or thereafter. Fink, supra; Southern Pacific Co. v. Wheaton Brass Works, 5 N.J. 394 (1950).
All parties to domestic interstate shipment contracts are presumed to know the law. Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company v. Pink, supra.
In Great Northern Railway Co. v. Hyder, 279 F. 783 (1922), the issue presented for determination was whether a consignee, who is not at any time the owner of the goods shipped, who has not agreed with either the shipper or the carrier that he will pay the freight, who accepts the goods upon the carrier’s representation that the freight has been prepaid, can be bound by such acceptance to pay the freight. The court decided that it could, reasoning that estoppel should not apply since “the shipper, the carrier, and consignee are all agents and trustees for the public, and no complications arising out of the agreements between them, or shuffling, should defeat the purpose of the *131 act acquiring full and exact payment of the freight as fixed by the filed, posted and published tariff.”
In Western Atlantic R. Co. v. Underwood, 281 F. 891, the court found that “the consignee cannot accept delivery without incurring liability for the carrier’s charges, known or unknown, supposed to be prepaid or otherwise, and no matter what the consignee’s actual relation to the shipper is.” The court went on to say that if the consignee was thus made liable for a charge which he should not bear, his recourse is on the shipper. The carrier was not bound by the private rights of the parties to the transportation, whether known or unknown to it, and could look for payment to the shipper or the consignee, who upon acceptance of the goods becomes statutorily liable to discharge the carrier’s lien thereon. Also see Southern Pacific Company v. Miller Abattoir Company, 454 F. 2nd 357 (3rd Cir. 1972).
Hallamore seeks to avoid any liability for the freight charges by claiming that it had no knowledge of the fact that it was a consignee and that Conrail knew it had no beneficial interest in the cargo it was handling. Here, Hallamore itself is a common carrier engaged in interstate commerce; the charges sought arose out of transactions engaged in interstate commerce; Hallamore is aware of the methods by which freight charges and the collection thereof are handled; it was Hallamore’s obligation to see to it that the ultimate recipient of the goods shipped pays all freight charges prior to releasing the cargo to the entity ultimately taking title to it.
When Hallamore, as designated consignee, unloaded the cargo from Conrail and shipped it to Eastern Steel Services, Inc., Quonset Point, R.I., it became liable to Conrail for freight charges under the Interstate Commerce Act irrespective of the fact that it did not receive copies of the bills of lading or waybills until this action was commenced, or that it had no knowledge that it was a consignee.
Hallamore did not have beneficial title to the cargo and. was acting as an agent for the sole purpose of transhipping the cargo to Eastern Steel Services, Inc. Here Conrail is only seeking freight charges for delivery of the cargo it carried to Worcester, Massachusetts, in the sum of $9,118.57 and not for additional rates that may be found to be due, after delivery to Hallamore, for transhipment of the cargo to Eastern Steel Services, Inc., Quonset Point, Rhode Island.
Judgment affirmed.
Report dismissed.
*132 [[Image here]]
*133 [[Image here]]

 49 USCS §10744 INTERSTATE COMMERCE “10744. Liability For Payment of Rates, (a)(1) Liability for payment of rates of transportation for a shipment of property by a shipper or consignor to a consignee other than the shipper or consignor, is determined under this sub-title when the transportation is provided by rail, motor, or water common carrier under this subsection. When the shipper or consignor instructs the carrier transporting the property to deliver it to a consignee that is agent only, not having beneficial title to the property, the consignee is liable for rates billed at the time of delivery for which the consignee is otherwise liable, but not for additional rates that may be found to be due after delivery of the consignee gives written notice to the delivering carrier before delivery of the property—
(A) bf the agency and absence of beneficial title; and
(B) of the name and address of the beneficial owner of the property if it is reconsigned or diverted to a place other than the-place specified in the original bill of lading.
(2) When the consignee is liable only for rates billed at the time of delivery under paragraph (1) of this subsection, the shipper or consignor, or, if the property is reconsigned or diverted, the beneficial owner, is liable for those additional rates regardless of the bill of lading or contract under which the property was transported. The beneficial owner is liable for all rates when the property is reconsigned or diverted by an agent but is refused or abandoned at its ultimate destination if the agent gave the carrier in the reconsignment or diversion order a notice of agency and the name and address of the beneficial owner. A consignee giving the carrier, and a reconsignor or diverter giving a rail carrier, erroneous information about the identity of the beneficial owner of the property is liable for the additional rates."

Section 10744 codifies the new repealed 49 U.S.C. §§ 3(2) and 323. In codifying these sections, as well as the entire Interstate Commerce Act, Congress made clear that:
Lake other codifications undertaken to enact into positive law all titles of the United States Code, this bill makes no substantive change in the law. It is sometimes feared that mere changes in terminology and style will result in changes in substance or impair the precedent value of earlier judicial decisions and other interpretations. This fear might have some weight if this were the usual kind of amendatory legislation where it can be inferred that a change of language is intended to change substance. In a codification statute, however, the courts uphold the contrary presumption: the statute is intended to remain substantively unchanged. H.R. Rep. No. 13906,95th Cong., 2nd Sess. 9 (1978), Reprinted in [1978].