**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Richard FELDMAN and Richard Martenson, Defendants-Appellants.**

**Nos. 86–1387, 86–1869 and 86–1870.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1987.

Decided July 15, 1987.

Rehearing Denied Aug. 10, 1987.

Richard C. Leng, Barrington, Ill., for defendant-appellant Martenson.

Richard Feldman, pro se.

John F. Podliska, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, CUDAHY and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

The defendants, Richard Feldman and Richard Martenson, appeal their convictions and sentences for mail fraud, wire fraud and racketeering. The defendants were involved with a company known as First Guaranty Metals ("FGM"); FGM was a Florida corporation established in 1978 that was engaged primarily in the retail sale of leveraged futures contracts in precious metals, including gold, silver and platinum. Feldman was one of FGM's owners. Martenson's exact role in the company is unclear; at various points in the record he is described as a partner, trader and consultant.

FGM dealt with investors across the nation from its offices in Boston and Miami. Its customers invested in precious metals, primarily through the purchase of twenty-five year contracts. The customer was required to pay ten percent of the value of the precious metals represented by the con-

tract, hence the term "leveraged" contract. The customers were told by FGM salesmen that they could obtain delivery of the metals at any time during the life of the contract by payment of the balance of their contract price plus interest. They were also told that they could sell their contracts back to FGM at any time, thereby permitting them to speculate in the shifts in the market price of the metals. Investors could resell their contracts only to FGM. Alternatively, customers could choose to be paid any increase in the market value of the metals purchased under the contract, or they could reinvest their profits in additional contracts. FGM's contracts obligated investors to pay interest on the unpaid balance of any purchase and to meet any margin call by FGM within two days of the call.[1] FGM charged a commission of one-and-one-half percent at the time of purchase and at the time of sale.

FGM's financial position began to deteriorate in July 1979; it eventually declared bankruptcy in early 1980. The immediate cause of FGM's problems was the volatility of the precious metals market during this period combined with some bad business decisions. Whether these decisions were also fraudulent is the heart of this case. The price of precious metals fluctuated dramatically between July 1979 and January 1980, and in July 1979 FGM began to retreat from its policy of fully "hedging" customer orders.[2] When investors attempted to sell their contracts back to FGM, the company began to impose increasingly greater "spreads" between the price at which a customer could buy and sell the same commodity on a given day. FGM thus would be selling metals at a much higher price than it would purchase

them from its customers, and its purchase price was significantly below the market price. During this period, FGM also put out margin calls to its customers, purportedly to cover its own losses in the market. On January 30, 1980, the FBI searched FGM's Miami office, seized all of the company's business documents and shut FGM down.

Feldman and Martenson were subsequently indicted for mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, fraudulent bullion transactions, 7 U.S.C. §§ 13(b), 23(b), and conducting an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(c); the indictment also requested forfeiture of property allegedly acquired by the defendants through a pattern of racketeering activity, 18 U.S.C. § 1963(a). The government claimed that the defendants made various misrepresentations in furtherance of a scheme to defraud approximately 1,100 FGM customers of over $11,000,000. Among these misrepresentations were the claims that FGM was fully hedging its customers' contracts, that FGM's prices were closely related to market prices and that it was as easy for a customer to sell his or her investment as it was to buy. The defendants claimed that they never intended to defraud the investors; they simply got caught in a period of wild fluctuations in the precious metals market. The district court entered acquittals on the bullion transactions counts, and the defendants were convicted by a jury on the remaining counts.

This court reversed the defendants' convictions on appeal because the district court had erred in admitting certain evidence and because the Speedy Trial Act had been

---

1. If the price of a commodity dropped, the loss would, of course, come out of the customer's equity. If a customer's equity fell to seven percent, he or she was required to invest sufficient additional funds to maintain an investment equal to ten percent of the value of the metals represented by the contract.

2. When a customer entered into a contract with FGM, the company would back or "hedge" the contract by purchasing either physical metals or futures contracts to purchase metals equal to the amount for which the customer had con-

tracted. This practice is employed to protect the company in the event the customer wishes to take delivery of the metals or claims his or her profits resulting from a subsequent rise in the market price. The "hedging" purchase should occur as close as possible to the time of the customer's purchase to protect the broker against any substantial increases in price. For a description of the role of hedging in an operation similar to FGM, see *United States v. Bentley*, 825 F.2d 1104, 1106 (7th Cir.1987).

violated. *United States v. Feldman*, 761 F.2d 380 (7th Cir.1985). The case was remanded for a new trial. The defendants were retried on the wire fraud, mail fraud and racketeering counts. The jury convicted on all counts. Feldman and Martenson now appeal.[3] The defendants challenge the admissibility of certain evidence and the sufficiency of the evidence. They also argue that their sentences were impermissibly enhanced after their second conviction. We affirm.

## I.

The defendants challenge the admission of testimony by a number of investors allegedly defrauded by FGM. The investors testified to statements made to them by FGM salesmen concerning the nature of FGM's business, the terms and conditions of buying and selling and the salesmen's advice respecting their investments. At trial, the defendants objected to these statements as inadmissible hearsay.[4] The district court permitted the introduction of this testimony on two grounds: (1) the testimony was offered as a verbal act and not for the truth of the matters asserted and therefore was not hearsay, Fed.R.Evid. 801(c)[5]; and (2) the statements were admissible as statements of the defendants' agents and therefore were not hearsay, *id.* 801(d)(2)(D).[6] Tr. at 51–52.[7]

The defendants claim that the court erred in admitting some of the conversations between investors and FGM salesmen under Rule 801(d)(2)(D) because: (1) the salesmen were not authorized to make some of the representations that were repeated by the investors in court; (2) some of the statements were made by salesmen from the Boston office, and the defendants were not shown to be in an agency relationship with those salesmen; and (3) some of the conversations about which the investors testified took place after Martenson left FGM.

■ The defendants' objection to the admission of these conversations apparently is based solely on a hearsay objection and is directed only towards their admissibility under Rule 801(d)(2)(D). One need not even reach the question whether these statements fall within Rule 801(d)(2)(D), however, to dispose of the hearsay objection. The statements testified to by the investors were not hearsay because they were not "offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The government offered the conversations between the investors and FGM salesmen to establish the existence of a scheme to operate FGM in a certain manner. Far from offering the statements for their truth, the government sought to show their falsity through independent evidence. *See United States v. Gibson*, 690 F.2d 697, 700 (9th Cir.1982) ("'investors' testimony was offered to prove the *existence* of a scheme; the statements were not offered for their truthfulness") (emphasis in original), *cert. denied*, 460 U.S. 1046, 103 S.Ct. 1446, 75 L.Ed.2d 801 (1983); *United States v. Toney*, 605 F.2d 200, 207 (5th Cir.1979), *cert. denied*, 444 U.S. 1090, 100 S.Ct. 1055, 62 L.Ed.2d 1179 (1980); *United States v.*

---

**3.** Martenson was represented by counsel on appeal. Feldman proceeded pro se. This court granted a motion to permit Feldman to join the brief filed on behalf of Martenson. Although the arguments raised in the brief are made only with respect to Martenson, we shall construe them as applying to Feldman insofar as possible.

**4.** The defendants also raised a sixth amendment objection which they do not renew on appeal.

**5.** Rule 801(c) defines hearsay as:
a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

**6.** Rule 801(d)(2)(D) provides:
(d) *Statements which are not hearsay.* A statement is not hearsay if—
. . . .
(2) *Admission by party-opponent.* The statement is offered against a party and is . . . (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship. . . .

**7.** "Tr." refers to the transcript from the defendants' second trial. "O.Tr." refers to the transcript from the defendants' original trial.

*Krohn*, 573 F.2d 1382, 1386 (10th Cir.), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978).

Although hearsay is not a viable objection to the admissibility of the salesmen's statements, a separate issue is whether these statements are admissible against Feldman and Martenson to establish their participation in and intent regarding the scheme to defraud FGM's investors. This question presents the issue of accountability: Can the statements made by the salesmen be attributed to Feldman and Martenson? A number of cases have addressed the question whether misrepresentations made by salesmen can be introduced against corporate officers charged with participating in a fraudulent scheme. These cases have analyzed the admissibility of such statements under the doctrine of agency. *See, e.g., Gibson*, 690 F.2d at 701; *Krohn*, 573 F.2d at 1386–87; *United States v. AMREP Corp.*, 560 F.2d 539, 545 (2d Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978). As framed in these cases, the question is whether the officers authorized, either impliedly or expressly, the making of the statements. "[T]he authorization by the defendant of such statements by a salesman may be found in the circumstances of the particular case, in the scope of the plan or scheme, or from other pertinent facts." *Krohn*, 573 F.2d at 1386 (citations omitted). The defendants' objections are relevant to this inquiry, and we consider each in turn.

The defendants' first objection is that certain statements made by salesmen to FGM investors were not shown to have been made within the scope of the agency relationship. These statements related to refusals to execute sales orders or to delays in executing such orders, quotations of resale prices that were significantly below the market rate, representations regarding the location of FGM's inventory of precious metals, explanations as to why margin calls were being imposed and discussions of unauthorized trading on customers' accounts.

This claim is without merit. Through the testimony of Michael Goldstein, an FGM employee, the government established that these statements were in fact either expressly or impliedly authorized by Feldman and Martenson. Goldstein was FGM's in-house legal counsel and office manager in the Miami office from May 1979 until FGM was shut down by the FBI. With respect to representations regarding FGM's repurchase prices, Goldstein testified that Feldman and Martenson were both involved in setting the price at which FGM would buy back its investors' contracts; the salesmen simply conveyed this information to investors who contacted them about selling their contracts. Tr. at 433, 449(2). As to statements regarding the location of FGM's inventory of precious metals, Goldstein testified that he heard Martenson specifically instruct a salesman to tell an inquiring customer that FGM had vaults all over the country when in fact it did not. Tr. at 446. The jury could have inferred from this exchange that salesmen were authorized to make glowing representations regarding FGM's inventory to induce investments. With respect to salesmen's statements about margin calls, the government introduced evidence that part of the scheme was to impose unnecessary margin calls on investors. Feldman himself specifically instructed the salesmen that customers must meet FGM's margin calls, even if the market subsequently improved. Tr. at 449(4). The government also presented evidence that unauthorized trading in customers' accounts was ratified, at least implicitly, by Feldman and Martenson. Goldstein testified that his duties included handling customer complaints and that a number of these complaints during the last quarter of 1979 involved unauthorized trading. When Goldstein informed the defendants about this problem, Martenson and Feldman both instructed Goldstein to stall the customers as long as possible. Tr. at 449(15)–(16). Goldstein also testified that FGM had a policy of encouraging turnover in customers' accounts in order to generate additional sales commissions. Tr. at 442. The jury could well have inferred from evidence of this policy in combination with the unanswered customer complaints that the defendants approved unauthorized trading.

The defendants also contend that they should not be held responsible for the statements of salesmen from FGM's Boston office. They allege that the government did not establish that they were in an agency relationship with these salesmen. We find this argument without merit. An agent-principal relationship is present if the agent acts on behalf of the principal and subject to his or her control and if the agent consents to so act. *Southern Pac. Transp. Co. v. Continental Shippers Ass'n*, 642 F.2d 236, 238 (8th Cir.1981). The Boston office was established as an affiliate of FGM's Miami office. Feldman contracted with John Carter to set up the Boston office in October 1979. Carter actually ran the day-to-day operations of the office, but his moves were closely watched from Miami and all of the major decisions were made for Boston in Miami. The Miami office was run under FGM's rules and regulations. Tr. at 449(28). The prices at which FGM traded its contracts were set in Miami, and all sales were approved in Miami by Feldman or Martenson. Tr. at 449(28)–(29). Money obtained from investors through the Boston office was sent to FGM, and sales confirmations were sent from Miami. Tr. at 449(28), (29). Although Carter actually hired and paid the salesmen who worked out of Boston, two salesmen from Miami were sent to Boston for a week to train those salesmen. Tr. at 449(30)–(31). Customer complaints were referred to Goldstein in the Miami office, Tr. at 470, and the same customer brochures were used in Boston as in Miami, Tr. at 449(31). This evidence amply demonstrates that the Boston salesmen were agents of Feldman and Martenson.

A final argument made on behalf of Martenson is that he should not be held responsible for any salesmen's statements made after he left FGM, which apparently occurred about December 20, 1979. Because Feldman was involved with FGM until it was shut down by the FBI at the end of January 1980, these statements were still admissible against him. We conclude that statements made by FGM salesmen after December 20, 1979 are also admissible against Martenson. Although there is no evidence that Martenson was actively participating in the conduct of FGM after December 20, 1979, Martenson never affirmatively established that he had withdrawn from the scheme. *Cf. United States v. Andrus*, 775 F.2d 825, 850 (7th Cir.1985) (To withdraw from a conspiracy, a conspirator must take steps to disavow or defeat the purpose of the conspiracy, either by communicating the fact of his withdrawal to his co-conspirators or by informing the authorities of the conspiracy.). Thus, statements made by Feldman (Martenson's co-schemer) and by FGM salesmen after December 20, 1979 for the short period before FGM ceased operations, that were in furtherance of the scheme, can be attributed to Martenson.

## II.

The defendants contend that the trial court erred by admitting the testimony of Richard Newham under Federal Rule of Evidence 404(b).[8] The testimony given by Newham was substantially identical to his testimony during the defendants' first trial. On both occasions, Newham testified respecting the defendants' involvement with Continental Coin Exchange ("CCE"). Feldman and Martenson were involved with CCE prior to the formation of FGM, and CCE, like FGM, dealt in the retail sale of leveraged contracts for precious metals. The purpose for which the government offered Newham's testimony was also the same during both trials. By showing Feldman's and Martenson's involvement with CCE, the government attempted to show that they were familiar with this type of business and operated FGM with the intent to defraud its customers; through this testimony, the government countered the de-

---

**8.** Rule 404(b) provides:

(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

fendants' assertion that FGM's balloon burst because of their naivete in the precious metals market. O.Tr. at 1287–88, 1290, 1291–92, 1294–95. Tr. at 962–63, 973–75. When the defendants first appealed, they challenged the admission of Newham's testimony. This court rejected this claim, finding "no error in the admission of the prior similar acts because they had substantial relevance to showing intent or the absence of mistake that outweighed the risk of prejudice." *Feldman*, 761 F.2d at 389 (citation omitted).

We decline to reconsider the admissibility of Newham's testimony here. Under the doctrine of law of the case, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *Redfield v. Continental Casualty Co.*, 818 F.2d 596, 605 (7th Cir.1987) (citations omitted); *see Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). "This doctrine serves to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." 18 C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* § 4478, at 788 (1981 ed.). Although the invocation of the law of the case doctrine lies within the discretion of the court, the defendants have offered no reason why this doctrine should not be applied here. Any variations between Newham's testimony in the first and second trials were insignificant. The only difference between the two proceedings with respect to Newham's testimony is that he was not cross-examined during the first trial. The defense in the second trial attempted to trip up Newham's assertion that CCE did not maintain an inventory of precious metals, and it also attempted to show that Newham was not a credible witness. We do not see why the testimony brought out on cross-examination should cause us to reconsider our earlier conclusion that Newham's testimony was admissi-

ble to establish the defendants' familiarity with leveraged contracts for precious metals, and the defendants do not argue that Newham's testimony was so unreliable that it should not have been admitted.[9] We therefore apply the law of the case to the admissibility of Newham's testimony and do not reconsider the merits of this issue.

### III.

■ The defendants next claim that, if the testimony of Newham and FGM's customers is excluded, there is insufficient evidence to establish that they were involved in a scheme to defraud investors. We have already concluded, however, that this testimony is admissible against both defendants. After our own review of the record in this case, construing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we conclude that there was ample evidence to support the defendants' convictions. We would reach the same conclusion even if the testimony objected to were excluded.

FGM represented in its account agreement and customer brochure that it would purchase either the physical metal ("physicals") or futures contracts in an amount equal to the amount of merchandise represented by a purchase agreement. GX–Shur 4, ¶ 9 (account agreement). FGM, however, was far from fully hedged during the period covered by the indictment, and the government presented evidence that Martenson and Feldman were aware of FGM's situation because they were in charge of purchasing the physicals and contracts to hedge FGM's customer accounts. From July 1979 until late September 1979, Martenson was primarily responsible for these purchases. From September to mid-December, Martenson and Feldman were jointly responsible for placing orders for physicals and futures contracts. From mid-December until FGM closed down at

---

**9.** The defendants also argue that we should reconsider their Rule 404(b) claim here because careful consideration of this issue was not necessary in the first appeal since this court reversed the convictions based on two other grounds. The rather summary disposition of this claim may have been due to its lack of merit rather than to this court's lack of attention.

the end of January 1980, Feldman was responsible for hedging.[10]

At trial the defendants did not deny that FGM failed to fully hedge its customers' contracts in gold, silver and platinum. Instead, they contended that these metals were unavailable because of massive purchases of silver by the Hunt brothers during this period. The government countered this argument through evidence establishing that physicals and futures contracts were in fact available during the indictment period. The government also introduced evidence that investors' money deposited in FGM's bank accounts was used for the benefit of the defendants rather than to hedge their customers' positions. The defendants used money from these accounts to pay Martenson $115,150 between July 9, 1979 and November 30, 1979, to pay Feldman $137,631 between July 9, 1979 and October 31, 1979, to invest $313,800 in a Miami restaurant owned by the defendants, to transfer $221,900 to an FGM account in the Cayman Islands, to pay $14,000 for a new car for Martenson's girlfriend and to buy 3892 Krugerrands (worth over $2.5 million in 1980) that were unaccounted for when FGM was shut down.

The government also introduced evidence that FGM imposed margin calls on its customers and would attempt to collect funds to meet the calls even after the market improved. Tr. at 449(4). FGM also had a policy of encouraging its customers to reinvest their excess equity in additional leveraged contracts. Tr. at 442. By keeping its customers' margins as close as possible to the minimum amount required under their contracts, FGM could issue larger margin calls when the price of the metals dropped. The ostensible purpose for a margin call on customers by FGM was to cover the margin calls being made on FGM by other brokers. However, to the extent FGM was not hedged, it was not facing margin calls as prices declined in the market.

The government also introduced evidence that FGM had instituted a number of practices to discourage customers from selling their contracts. The price of precious metals climbed to very high levels during the fall of 1979 until mid-January 1980. Because FGM did not hedge its customers' accounts, FGM would have lost huge sums of money if its customers decided to liquidate their contracts during a rising market. Although customers had been told when they first invested with FGM that FGM's prices were near the market price for the metals, the government introduced testimony that Feldman instituted a price "spread" in September 1979 to discourage customers from selling back their contracts. FGM would buy contracts back from customers only at a price far below the market price for the metal. Martenson and Feldman also instructed Goldstein that he was to stall off customer complaints as long as possible. Tr. at 449(7). We conclude that the government introduced sufficient evidence to establish a fraudulent intent on the part of Feldman and Martenson in their operation of FGM.

## IV.

The defendants' final argument is that their sentences were impermissibly enhanced after their retrial. After their first convictions, Judge Leighton sentenced Feldman and Martenson to twelve years incarceration and imposed a $38,000 fine on each. The judge also ordered the forfeiture of the following sums: (1) $116,882 obtained by Feldman from FGM; (2) $115,-150 obtained by Martenson from FGM; and (3) $221,900 obtained from FGM as to

10. The government also presented evidence establishing the amounts by which FGM was underhedged during the indictment period. Between July 20, 1979 and September 6, 1979, silver was hedged between 79.9% and 4.2%, and gold was hedged between 91.3% and 51.0%. Thus, contrary to Martenson's assertions, FGM was not fully hedged even prior to late September 1979 when Feldman began working full-time at FGM. Tr. at 449(2).

From September 14, 1979 through January 30, 1980, silver was never hedged by more than 4.0%; for most of this period, silver was hedged by one-tenth of 1% or less. During this same period, gold was never hedged by more than 35.6% and was above 30% only once after November 2, 1979.

which the defendants were held jointly liable. The court denied forfeiture as to 3892 Krugerrands. After their second conviction, Judge Williams imposed the same terms of incarceration and fine. The court also entered a forfeiture order pursuant to a jury verdict that found the following subject to forfeiture: (1) $115,149 paid to Martenson by FGM; (2) all FGM stock owned by Feldman; (3) Feldman's interest in 3892 Krugerrands or their value as of the date they were acquired; (4) the defendants' ownership interest in $313,800 paid to another enterprise; (5) Feldman's interest in $221,900 transferred to a Swiss bank account and then to an FGM account in the Cayman Islands; and (6) $137,631 paid to Feldman by FGM. In addition, Judge Williams ordered the defendants placed on probation for five years following their terms of incarceration, and as a condition of probation, Judge Williams ordered Feldman and Martenson to repay $3.5 million to victimized investors; the defendants were jointly liable for this sum, and any payments made pursuant to the forfeiture order would be credited against the $3.5 million. On appeal, the defendants claim that the imposition of the $3.5 million restitution requirement after retrial violated the double jeopardy and due process clauses.

■ The imposition of a harsher sentence upon retrial does not violate the double jeopardy clause, *Chaffin v. Stynchcombe,* 412 U.S. 17, 23–24, 93 S.Ct. 1977, 1981–82, 36 L.Ed.2d 714 (1973); *North Carolina v. Pearce,* 395 U.S. 711, 720–21, 89 S.Ct. 2072, 2078–79, 23 L.Ed.2d 656 (1969), unless a jury or appellate court necessarily concluded during the first round of proceedings that the prosecution had not proved that the defendant should be given the harsher penalty, *Bullington v. Missouri,* 451 U.S. 430, 443–45, 101 S.Ct. 1852, 1860–67, 68 L.Ed.2d 270 (1981). The defendants do not argue that this exception applies here.

■ We also reject the defendants' due process challenge. The Supreme Court has held in numerous cases that the due process clause prohibits increased sentences upon retrial when the increase was motivated by vindictiveness on the part of the sentencing judge. *See, e.g., Texas v. McCullough,* 475 U.S. 134, ——, 106 S.Ct. 976, 978–79, 89 L.Ed.2d 104 (1986); *Chaffin,* 412 U.S. at 24, 93 S.Ct. at 1981. In *Pearce,* 395 U.S. 711, 89 S.Ct. 2072, the Supreme Court created a presumption that an increased sentence after retrial was the result of judicial vindictiveness and that this presumption could only be rebutted if the sentencing judge gave as reasons "objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." *Id.* at 726, 89 S.Ct. at 2081. The Court, however, subsequently indicated that the *Pearce* presumption does not operate in every case in which a defendant receives a harsher sentence upon retrial, and in cases in which the presumption does not apply, the defendant must establish actual vindictiveness upon resentencing. *See, e.g., Colten v. Kentucky,* 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972) (presumption does not operate when the second court in a two-tier trial system imposed a longer sentence); *Chaffin,* 412 U.S. at 26–28, 93 S.Ct. at 1982–83 (presumption of vindictiveness is not applicable where a jury imposed the increased sentence on retrial). The presumption is also not applicable when the defendant concedes and it is clear that the second sentencing judge was not vindictive, *Moon v. Maryland,* 398 U.S. 319, 320–21, 90 S.Ct. 1730, 1730–31, 26 L.Ed.2d 262 (1970), because vindictiveness of a sentencing judge is the evil at which the due process clause is aimed rather than enhanced sentences upon retrial, *McCullough,* 475 U.S. at ——, 106 S.Ct. at 979. As in *Moon,* defense counsel here stated during oral argument that he was not contending that the second sentencing judge was vindictive,[11] and we found no

---

11. During oral argument, the panel asked the attorney for the appellants whether he was basing his challenge to the enhanced sentence on

the due process clause or on the double jeopardy clause. In response, the attorney stated:
    I don't believe I have a vindictive prosecution argument to base this on. I do not see any

suggestion in the record that Judge Williams imposed the restitution order for any reason other than to punish the defendants for defrauding FGM's customers. In light of counsel's admission and after our own review of the record, we conclude that there is no basis on which the defendants can claim that the due process clause was violated in this case.

AFFIRMED.

basis for stating that Judge Williams acted to punish these defendants for exercising their

right to trial.