**INMAN FREIGHT SYSTEMS, INC.,
Jim S. Green, Trustee,
Plaintiff/Petitioner,**

v.

**BOISE CASCADE
CORPORATION, Defendant,**

and

**United States of America and Interstate Commerce Commission, Respondents.**

**No. 83 C 8968.**

United States District Court,
N.D. Illinois, E.D.

Aug. 2, 1988.

---

Ronald M. Hill, Steven C. Weiss, Diamond & Weiss, Chicago, Ill., for plaintiff/petitioner.

Patrick H. Smyth, Smyth & Guth, Chicago, Ill., for defendant.

## MEMORANDUM OPINION
## AND ORDER

ASPEN, District Judge:

Plaintiff Inman Freight Systems, Inc. ("Inman") brought this action under the Revised Interstate Commerce Act, 49 U.S.C. § 10761(a), against Boise Cascade Corporation ("Boise Cascade") seeking the collection of freight undercharges on various interstate shipments of goods. We referred the matter to the Interstate Commerce Commission ("ICC"). The ICC ruled against Inman, which then named the United States and ICC as respondents. The parties now move for summary judgment. For the reasons set forth herein, we grant in part and deny in part Inman's motion for summary judgment. We also grant Boise Cascade's and the ICC's motions.

Factual Background [1] and
Procedural History

Inman, a motor carrier within the meaning of the Interstate Commerce Act, 49 U.S.C. § 10101, and Boise Cascade entered into an agreement by which Inman would carry various goods, including metal can ends from Tennessee to Missouri and tin plates from Illinois to Tennessee. Between February 1980 and May 1981, Inman transported the goods without incident. In apparent expectation of a lower carrier rate, Boise Cascade loaded the goods onto Inman's carriers. It is disputed whether Boise Cascade actually counted the goods to make sure the amount they loaded corresponded with the amounts noted on the bills of lading.

1. The facts set forth in this section are undisputed unless noted otherwise.

2. Section 10701 provides in pertinent part:

Inman billed Boise Cascade for the can ends under the published tariff rate ICC MWB 240 Item 11280, subject to ICC MWB 125–F Item 578, and for the tin plates under the rate ICC CSA 240–F Item 6530. Inman later filed for bankruptcy, and its auditor Carriers Traffic Service ("CTS") determined that both tariff rates were inapplicable. Specifically, CTS determined that Boise Cascade was undercharged in the amount of $32,800.00 (later recalculated as $39,444.09) for transportation of the can ends because Boise Cascade did not comply with the following condition precedent (hereafter the "notation requirement") to application of the reduced rate of Item 578:

(1) At time of shipment, consignor must endorse on the Bill of Lading and Shipping Order the notation "Consignor load and count and/or consignee must unload" the shipments as the case may be.

      \*    \*    \*    \*    \*    \*

(6) If the consignor fails to comply with the requirements of paragraph (1) herein, or if for any reason the consignor or any party tendering any portion of the shipment refuses to perform the loading and counting or the consignee, or any party receiving any portion of the shipment refuses to perform the unloading and counting, the rate will not apply and rates otherwise published will be assessed.

CTS also determined that Boise Cascade was undercharged in the amount of $22,118.47 for the transportation of the tin plates because the sheets were shipped in closed vans when the charged rate presumed shipment by flat-bed or convertavan trailers.

Boise Cascade refused to pay the requested balance, and Inman filed this action on December 7, 1983. Boise Cascade raised the defense that pursuit of these freight undercharges is an unreasonable practice under 49 U.S.C. § 10701(a).[2]

§ 10701. Standards for rates, classifications, through routes, rules and practices.
(a) A rate (other than a rail rate), classification, rule, or practice related to transportation or service provided by a carrier subject to the

Recognizing the ICC's exclusive primary jurisdiction over this determination, we referred the action to the ICC for proceedings on the reasonableness of assessing the higher rates. In a January 17, 1986 order, the ICC found application of the higher rates for the transportation of both the can ends and tin plates reasonable. Boise Cascade appealed, and the ICC reversed its decision as to the can ends, holding that application of the notation requirement of Item 578 as a condition precedent to receipt of the lower rate under Item 578 is an unreasonable practice, and Inman is accordingly not entitled to a higher rate. ICC Decision No. MC–C–10928 (August 12, 1987). The ICC affirmed the decision that Inman is entitled to the higher rate for transportation of the tin plates.

Inman then moved to reinstate this case in order to recover the tin plates undercharges and challenge the decision of the ICC as to the notation requirement. Inman now moves for summary judgment seeking undercharges for transportation of the tin plates and can ends and contending that the ICC's decision that Item 578 as applied is an unreasonable practice was arbitrary, capricious and contrary to law. In its response and own motion for summary judgment, Boise Cascade concedes liability for the tin plates undercharges but argues that the Court should uphold the ICC's decision as to the notation requirement. The ICC in its motion for summary judgment seeks affirmance of its decision.

### Standard of Review

The guidelines under which we review the ICC's decision are clearly delineated in statutory and decisional law. Section 10(e) of the Administrative Procedure Act generally provides in pertinent part that the district court should set aside any agency decision or action that it finds to be

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\*     \*     \*     \*     \*     \*

jurisdiction of the Interstate Commerce Commission under chapter 105 of this title must

(E) unsupported by substantial evidence in a case … reviewed on the record of an agency hearing provided by statute;  or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).

In assessing a decision under the "arbitrary and capricious" standard, the court will overturn the decision only if the ICC based the decision on irrelevant factors or clearly erred in its judgment. The court should not substitute its own judgment for that of the ICC's. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). Findings of fact and as to the reasonableness of application of a tariff rate are entitled to substantial deference and generally upheld when the court finds a rational basis for the findings. *Atchison, T. & S.F. Ry. Co. v. Trailer–Train, Inc.,* 455 F.Supp. 520, 523 (N.D.Ill.1978).

This deference is not, however, unbounded. The Seventh Circuit, in articulating the arbitrary and capricious standard, has made clear that the district court should avoid transforming deference to the ICC into a rubber stamp of its decisions:

The primary requirement of the "arbitrary and capricious" standard of review is the "simple but fundamental rule of law" that an "agency must set forth clearly the grounds on which it acted." While we accord full deference to the expertise and discretion of the ICC and the presumptions to which its actions are entitled by law, this deference is not intended to shield the agency's action "from a thorough, probing, in-depth review." As the Fourth Circuit in *National Crushed Stone Ass'n v. E.P.A.* [601 F.2d 111 (4th Cir.1979) ] stated, "[c]ourts are no longer satisfied with bare administrative *ipse dixits* and the [a]gency must make reasoned decisions with full articulation of the reasoning and take

be reasonable.

into account all relevant factors." (Citations omitted).

*Illinois v. United States*, 666 F.2d 1066, 1073 (7th Cir.1981).

### The Can Ends Notation Requirement

■ With these guidelines and accompanying reservations in mind, we now turn to Inman's specific challenges to the ICC's decision that application of the higher tariff rate as a result of Boise Cascade's failure to comply with the notation requirement is unreasonable as applied to the can ends shipment. Based on evidence of industry custom, testimony in the proceedings before the ICC and tariff rules, the ICC found that Boise Cascade actually loaded and counted the can ends cargo and thereby substantially complied with the requirements of the lower tariff rate. The ICC concluded that these activities by Boise Cascade relieved Inman of its duty to assist in loading and counting and of the accompanying liability risks, and Inman therefore received a benefit justifying charging Boise Cascade at the lower rate of Item 578, despite Boise Cascade's failure to appropriately notate the shipment.

Inman's primary challenge to this decision is that the ICC, by failing to recognize certain legal ramifications of the notation requirement, allowed Boise Cascade to enjoy a benefit in the transaction for which it did not pay compensation at the lower tariff rate of Item 578. Specifically, by notating the shipment, Boise Cascade concedes in any litigation arising out of a claim of loss or damage to the shipment, that it loaded and counted the goods by itself and thereby guaranteed the kind and quality of goods. By failing to abide by the notation requirement, Boise Cascade placed the burden upon Inman to prove in any claim of loss or damage that Boise Cascade made that guarantee. The ICC recognized that this burden-shifting accompanies a load and count notation, but decided that since Boise Cascade, unassisted, loaded and counted the can ends and thereby assumed the pertinent liability, and Inman suffered no actual loss as a result of its retaining the burden of proof since there was no actual damage claim and Inman did not

obtain additional insurance to cover a potential loss, it would be unreasonable to charge Boise Cascade a higher rate for a benefit that Inman may have but did not actually receive.

The ICC's decision in this context was supported by the evidence and was not arbitrary and capricious. A load and count notation by itself does not shift liability from the carrier to the shipper. Rather, it merely shifts an evidentiary burden in any damages claim arising from the shipment. At most, a notation on the bill of lading relieves the carrier of proving that it disavowed any guarantee as to the kind and quality of goods that it received from the shipper. Conversely, in the absence of the notation, there is a presumption that the shipper did not cause the damage or loss, and the carrier bears the burden of establishing the shipper's sole responsibility. *Johnson & Johnson v. Chief Freight Lines Co.*, 679 F.2d 421 (5th Cir.1982).

In this case, there was no damages claim, and consequently Inman did not have to bear the expense or vagaries of any additional evidentiary burden as a result of Boise Cascade's failure to notate the shipment. Implicit in the ICC's decision is the conclusion that Boise Cascade's relieving Inman of its duty to assist in the load and count constituted adequate consideration for the lower tariff rate, and allowing the higher rate based solely on lack of the notation requirement unreasonably enriches Inman. The ICC was not arbitrary and capricious in concluding that it is an unreasonable practice to compensate Inman, at Boise Cascade's expense, for bearing the risk of assuming an evidentiary burden (as opposed to the more significant risk of liability that Boise Cascade assumed notwithstanding the lack of notation) that Inman did not actually exercise.

The parties dispute the implication of various cases and other ICC decisions to our evaluation of the IC's decision here. In *Western Transp. Co. v. Wilson and Co.*, 682 F.2d 1227 (7th Cir.1982), the Seventh Circuit addressed a virtually identical tariff rate provision. The Court held that the district court must award Western, the

carrier, undercharges when Wilson, the shipper, failed to comply with the condition precedent to a lower rate that "the Bill of Lading and Shipping Order covering the shipment must contain a notation that consignor is to load and/or consignee is to unload the shipment as the case may be" even though, as here, Western suffered no tangible loss as a result of Wilson's failure to notate. The Seventh Circuit rejected, despite the apparent harshness of the result, Wilson's attempt to evade the notation requirement through an equitable defense available in contract actions but unavailable as a defense to application of an unambiguous published tariff rate. The Court did, however, recognize that Wilson could have avoided the higher rate if Wilson successfully petitioned the ICC to declare application of the higher rate unreasonable:

> But it does not follow that the shipper is necessarily without any remedy in a case like this. A tariff provision has to be reasonable.... If the notation requirement is, as it appears to be, entirely pointless, *the Commission can be expected to set aside this part of the tariff*—thus knocking the props out from under Western's case—if asked to do so. Wilson should have done what [another shipper] did when sued by Western ... on the very tariff in issue in this case— ask for a stay of the court proceedings and then ask the Commission to declare the notation requirement unreasonable. The Commission did so.... Although it seems highly likely that the Commission would, if asked, hold that the notation requirement was unreasonable as applied to Wilson ... the district court did not have the power to declare the requirement unreasonable. (Citations omitted). (Emphasis added). *Id.* at 1231–32.

The distinction was crucial in that case and is equally crucial here. Boise Cascade could not avoid the higher tariff rate by asking this Court to find application of that rate unreasonable. *See also Motor Carrier Audit & Collection v. Casio*, No. 87 C 6124 (October 27, 1987) (Aspen, J.). Boise Cascade could and did avoid the higher rate by petitioning the ICC to find application of the rate to this transaction unreasonable.

Inman also attempts to characterize the ICC's decision here as contrary to its decision in *Winthrop Laboratories Div. v. Dorn's Transportation, Inc.*, 325 I.C.C. 654 (1964). The decisions are reconcilable. In *Winthrop*, the ICC focused on shifting liability, not shifting evidentiary burdens of proof:

> The purpose of maintaining released-value rates is that a shipper may have the choice of two rates, under the higher of which unlimited carrier's liability attaches and under the lower of which the shipper, in consideration of the reduced rate, by fair and reasonable agreement declares or agrees that for the purpose of claim in case of loss or damage the value of his shipment is a certain amount, or not in excess of a certain amount specifically published as authorized. The shipper is given the option of paying the regular rate and holding the carrier to its stated liability in accordance with the terms and conditions of the bill of lading or of choosing the lower released-value rate with its corresponding reduction of carrier liability. *Id.* at 656.

The ICC did suggest that failure to comply with a notation requirement by itself may justify imposition of a higher tariff rate: "Where tariff provisions require the making of a particular notation on the bill of lading as a condition precedent to the use of a rate, the shipper is bound by such provisions, and noncompliance therewith generally affords no basis for a finding that the rate legally applicable is unreasonable or unjustly discriminatory." *Id.* at 657, *quoting Embassy Distributing Co., Inc. v. Western Carloading Co.*, 280 I.C.C. 229, 234 (1951). That language did not, however, preclude ever finding application of a higher rate an unreasonable practice when, as here, the shipper actually loads and counts without the assistance of the carrier, and the carrier does not actually defend a damages claim or incur greater insurance expense. Further, to the extent that this language is absolute, we will not hold the ICC to all of its prior pronouncements. Rather, the ICC must be given some leeway to re-examine and re-interpret its prior holdings for the unique circumstances of a particular case as long as it

makes its reasons known to the reviewing court with sufficient clarity, as it has done here. *Atchison, T. & S.F. Ry. Co. v. Wichita Board of Trade,* 412 U.S. 800, 817, 93 S.Ct. 2367, 2380, 37 L.Ed.2d 350 (1973).

Inman also contends that the ICC based its decision on industry custom which is inadmissible to vary the terms of a published tariff rate. In *Atlantic C.L.R. Co. v. Clinchfield Fuel Co.,* 94 F.Supp. 992 (W.D. S.C.1951), the court held that the shipper cannot use industry custom as an excuse under a theory of equitable consideration for failure to abide by tariff requirements. We fail to see the relevance of that holding to the ICC's decision here. The ICC used evidence of industry custom to support its factual finding that Boise Cascade actually loaded and counted the cargo. The ICC found application of the higher rate unreasonable not because of industry custom but because of Boise Cascade's actions, as evidenced by industry custom.

Finally, Inman contends that by its decision here, the ICC has encouraged rate discrimination among shippers since it essentially held that shippers in an industry without the custom that the shipper alone load and count must notate to obtain the advantage of the lower rate whereas shippers in an industry with such a custom need not. Again, this interpretation mischaracterizes the ICC's use of industry custom. The ICC held that application of the notation requirement is unreasonable when the shipper actually loads and counts the cargo, and the carrier did not defend against any damage claims or assume any additional insurance burden. Custom is merely evidence that the shipper alone loaded and counted the cargo. Indeed, we view the ICC decision here as promoting nondiscrimination. By looking at the individual circumstances of each case and distinguishing application of the notation requirement partially on the basis of who actually participated in the loading and counting of goods, the ICC assures that applicable rates reflect the actual balance of costs and benefits that accompany a shipping transaction.

### The Tin Plates Shipment

■ The ICC found that application of the higher rate to the tin plates shipment is a reasonable practice. Boise Cascade does not challenge that decision and indeed expressly concedes liability for those undercharges. We accordingly grant Inman's motion for summary judgment as to the tin plates shipment. We further consider an award of prejudgment interest on the tin plates undercharges appropriate, given the lapse of seven years between Inman's provision of the carrier services and this decision. *Michaels v. Michaels,* 767 F.2d 1185, 1204 (7th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986); *Norfolk & W. Ry. Co. v. North American Car Corp.,* 455 F.Supp. 424 (N.D.Ill.1978).

### Conclusion

We have not been provided any basis upon which we can conclude that the decision of the ICC was arbitrary and capricious or unsupported by the evidence. Accordingly, we deny Inman's motion for summary judgment as to the can ends shipments and grant Boise Cascade's and the ICC's motion for summary judgment. We grant Inman's motion for summary judgment as to the tin plates shipments in the amount of $22,118.47 plus interest from the dates of each shipment to the date of this decision. It is so ordered.