**CENTRAL STATES TRUCKING COMPANY, Plaintiff,**

v.

**PERISHABLE SHIPPERS ASSOCIATION, Agripac, Inc., J.R. Simplot Company, Western Alaska Fisheries Inc., Stemlit Growers, Skone & Conners Produce, Oregon Cherry Growers, Norpac Food Sales, New Century, National Frozen Foods Corp., Kraso–Joseph, Inc., Hansen Fruit and Cold Storage, Jack Frost Fruit Co., Distron Division of Pillsbury, Diamond Fruit Growers, Inc., Bellingham Frozen Foods, Defendants.**

No. 89 C 1948.

United States District Court, N.D. Illinois, E.D.

May 6, 1991.

Joel H. Steiner, Paul Anthony Gajewski, Axelrod, Goodman, Steiner & Bazelon, Chicago, Ill., for plaintiff.

Steven Henry Hoeft, Cathy Houston McNeil, McDermott, Will & Emery, P.C., Chicago, Ill., for J.R. Simplot Co.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Central States Trucking Company ("Central States"), an interstate common freight carrier, brings this collection action pursuant to the Interstate Commerce Act, 49 U.S.C. § 1 *et seq.*, against J.R. Simplot Company ("Simplot"), for shipping charges related to Simplot's freight. What would normally be a simple collection matter is complicated by the insolvency of the Perishable Shippers Association ("PSA"), a not-for-profit shippers' association formed pursuant to 49 U.S.C. § 1002(c) (recodified as 49 U.S.C. § 10562(3)). Not-for-profit shippers' associations obtain favorable shipping rates for their members by pooling their members' freight into larger shipments. By pooling freight in this way, the associations are able to negotiate favorable

shipping rates with common carriers. PSA paid the freight charges for each shipment and then charged the relevant amounts back to the individual members whose freight had been shipped. PSA pooled tractor-trailer loads of freight and then contracted with interstate carriers, such as Central States, to haul it. Simplot was a member of PSA. Simplot has paid PSA for all of its freight shipped by Central States; however, PSA became insolvent while still owning Central States $249,962.55. Central States now seeks to hold the solvent Simplot responsible for the freight charges, related to Simplot's freight, which the insolvent PSA did not pay.

Both parties have waived their right to trial, stipulated to have the court decide all disputed facts, and agreed to have the court enter judgment based upon the trial briefs and exhibits submitted.[1] We have subject matter jurisdiction pursuant to 28 U.S.C. § 1337. We find in favor of Central States and enter a judgment of $249,962.55 against Simplot. Our findings of fact and conclusions of law are set forth below.

## FINDINGS OF FACT[2]

1. Central States is a for-hire motor carrier operating in interstate commerce as both a common and contract carrier of general freight pursuant to licenses issued to it by the Interstate Commerce Commission. Fred Grane is President of Central States. His brother, Wayne Grane, is Vice President of Operations. Grane Aff. at ¶¶ 1 and 2. Grane Dep. at page 7.

2. PSA is a not-for-profit shippers' association formed for the purpose of moving freight from the Pacific Northwest to points throughout the United States using carriers including Central States. PSA hired Fred H. Tolan Traffic Services ("Tolan"), to manage PSA's operation. Dick E. Jones ("Jones") was employed by Tolan and was responsible for managing PSA.

Jones Dep. at pages 5, 7–11, 19–21, 101, 103–105.

3. PSA was formed to obtain lower freight rates for members by having larger volumes of freight shipped and controlled by one entity. Jones Dep. at page 20.

4. Simplot is in the frozen food business and ships products in interstate commerce. Ruth E. Walton ("Walton"), is Vice President of Operations and also was a member of the PSA Board of Directors from mid-1987 until 1989. Walton Dep. at pages 2–3.

5. Simplot was a member of PSA for all times relevant to this litigation. Walton Dep. at pages 5–6.

6. A Simplot member always attended PSA's annual meetings. Jones Dep. at pages 44–46.

7. PSA's Board of Directors consisted of five members who had general charge of the affairs of PSA and authority to act for PSA. PSA Bylaws Article V, §§ 1(a) and 6.

8. PSA members were responsible for all freight charges whether the freight was carried on a prepaid or collect basis. Failure of a consignee to pay collect freight charges resulted in those charges being collectible from the shipping member. PSA Bylaws, Article IX, § 5.

9. PSA members were free to direct PSA to ship their freight by a variety of methods, the most common two being door-to-door or ramp-to-ramp service. For door-to-door service, PSA would arrange to have a motor carrier pick up the member's trailers at the member's location and transport them to the nearest railhead where the freight was loaded onto a railroad car. Once the product reached a railhead near its destination, another motor carrier would pick up the trailer and deliver it to the destination.

When a member selected door-to-door service, it had the right to select the truck-

---

**1.** Central States has settled its claims against the remaining defendants.

**2.** We will cite to the depositions or affidavits where we find the facts which we adopt in our findings. We abbreviate those references by the last name of the deponent or affiant and "Dep."

or "Aff." respectively. Furthermore, we do not cite to contrary facts in the opposing parties' submission; instead, the reader should assume that we have resolved those disputes in favor of the party's submission which is included in our findings of fact.

ing company. Simplot primarily opted for door-to-door service but allowed PSA to choose the motor carrier.

A PSA member could also choose ramp-to-ramp service. For ramp-to-ramp service, PSA would only arrange for the railway movement of the freight. Members would be responsible for transporting their trailers to a railhead near their location and transporting their trailer from the railhead to the destination. Jones Dep. at pages 50–54. Walton Dep. at pages 78–79.

10. Simplot's identity was always available to both PSA and to Central States because each trailer order from PSA would identify the PSA member whose freight was being carried. Grane Dep. at pages 73–80.

11. Shipping rates varied according to which PSA member's freight was being hauled. During rate negotiations between PSA and Central States, the identity of the member whose freight was involved was always disclosed to Central States. This information was needed because the rate for each member's freight might vary according to each member's individual requirements for service and delivery. Grane Dep. at pages 58–59.

12. PSA members were not required to use PSA to transport their freight. Jones Dep. at pages 88–90, 91–92.

13. Immediately before PSA was going to suspend operations, Simplot began paying Central States directly for hauling PSA trailers carrying Simplot freight. Jones Dep. at pages 32–33.

14. Various rate factors were used to determine the total cost of hauling a member's freight. A single rate factor was assigned to each of the various segments of the route the freight would follow from the members' location to the ultimate destination. The total of these individual rate factors equalled the amount of the member's charge for that shipment. For example, the various rate factors used to determine the price PSA charged to Simplot for moving a trailer from Simplot's plant in Oregon to one of Simplot's larger customers in Ohio, using the door-to-door service, included the following: 1) picking up the trailer at the railhead in Pasco, Washington and driving to Simplot's depot in Hermiston, Oregon; 2) loading the trailer and then driving back to the railhead; 3) movement by rail carrier from Washington to Chicago; 4) picking up the load in Chicago and driving to Toledo, Ohio; and, 5) returning to Chicago with an empty trailer. Jones Dep. at pages 98–100.

15. The return of an empty trailer was always factored into the rate PSA charged its members. Jones Dep. at page 144.

16. The PSA Bylaws included a procedure for handling cargo loss whereby members would forward claims to PSA which in turn sent the claims on to the rail or motor carrier. PSA would submit the claims in the name of the member and would negotiate settlements on behalf of the member. PSA could not compromise a claim without the direct authorization of the member. An exception to this scheme was for losses due to refrigeration failures because PSA maintained an insurance policy for its members for those losses. Jones Dep. at pages 63–68, 177–178.

17. From 1984 through 1987, PSA experienced financial problems. By June 30, 1987, it had a negative net worth of $1,257,-633. Jones Dep. at pages 32–33.

18. The unpaid balance of freight charges presently due to Central States for the movement of Simplot's freight is $249,-962.55. Grane Aff. at ¶¶ 9 & 10.

19. Central States seeks $249,962.55 in damages, which is the amount of freight charges PSA owes Central States. Simplot has already paid PSA for the movement of freight represented by those charges. Walton Aff. at ¶ 32.

20. On March 14, 1989, Central States filed suit against 16 defendants including PSA and Simplot. All defendants except Simplot have been dismissed from the suit.

21. Central States and Simplot have stipulated to have the court decide all questions of fact and to enter judgment based upon the trial briefs and exhibits submitted by the parties.

22. Central States seeks $249,962.55 in shipping charges, plus prejudgment interest from the date of each invoice, and its costs against Simplot.

## CONCLUSIONS OF LAW

Central States wants to be paid; Simplot wants to avoid paying twice. The frustrating issue which we must decide to resolve this dilemma is whether a member of a not-for-profit shippers' association is individually liable for freight charges to a common carrier, in the event the association, which contracted with that carrier, and which has already received payment from the member, becomes insolvent before paying the carrier. Both parties agree that this issue should be decided on the basis of agency principles. If PSA is Simplot's agent, then Simplot is liable for the freight charges. *Southern Pac. Transp. Co. v. Continental Shippers Ass'n. Inc.*, 642 F.2d 236 (8th Cir.1981); *Metro Shippers, Inc. v. Life Savers, Inc.*, 509 F.Supp. 606 (D.N.J.1980).

We have found no Seventh Circuit opinion directed to this issue. Another Circuit has addressed this exact issue and in resolving the dispute adopted agency principles to find that the not-for-profit shippers' association before it was the agent of the member. *Southern Pac.*, 642 F.2d at 238. As in our case, in *Southern Pac.*, the common carrier had not received payment because the shippers' association went bankrupt. The Eighth Circuit found an actual agency relationship existed between the members and the association, and therefore the member of the bankrupt association was individually liable for freight charges corresponding to its freight shipments. *Southern Pac.*, 642 F.2d at 238. We find the Eighth Circuit's analysis instructive and will adopt it here.

The Eighth Circuit first defined agency as "the fiduciary relation that results from the manifestation of consent by one person to another that the other should act on his behalf and subject to his control, and consent by the other so to act." *Southern Pac.*, 642 F.2d at 238. This definition of agency has been adopted by the Seventh Circuit. *U.S. v. Feldman*, 825 F.2d 124, 129 (7th Cir.1987) (citing *Southern Pac.*, 642 F.2d at 238).

In affirming the district court's finding of an agency relationship, the Eighth Circuit approved the following factors which the district court below had found significant:

1. Each member exerted individual control over when and if goods were shipped;

2. A board of directors, solely made up of members, controlled the association;

3. The association processed shipments only upon a member's instruction;

4. The association acted solely as the shipper-members' agent in processing claims for loss and damage;

5. The association bore no direct responsibility for freight charges even though its name as a consignor appeared on the second consolidated bill of lading; and

6. The association's bylaws established that the association was organized as the authorized agent of each member.

*Southern Pac.*, 642 F.2d at 238. We find all these factors, except the final one, are present in this case.

Simplot had control over the freight it sent to PSA and was not obligated to use PSA if it could contract with other common carriers at more favorable rates. PSA's bylaws provide that the Board of Directors, made up solely of PSA members, have charge of the affairs of PSA and authority to act for it. PSA processed shipments only upon a member's instruction and also acted solely as the members' agent for processing a member's loss and damage claims. According to PSA's bylaws, members were responsible for their own freight charges.

The only distinguishing factor is that in our case, PSA's bylaws do not expressly provide that PSA is the actual agent for its members. We are not swayed to change our decision by this factor alone because the remaining factors are present and weigh in favor of agency. We therefore find that PSA was Simplot's agent and that Simplot is liable to Central States for Central States' unpaid shipping charges.

## ESTOPPEL

■ Simplot contends that Central States is estopped from pursuing its claim because it chose to do business with PSA after it became aware of PSA's financial difficulties. We will not estop Central States here because Simplot makes no allegation that Central States made any misrepresentation to it upon which it relied.

■ An estoppel arises when one party makes a misleading representation to another party and the other party reasonably relies to his detriment on that representation. *Black v. TIC Invest. Corp.*, 900 F.2d 112, 115 (7th Cir.1990). Here, we are not aware of any misrepresentation on the part of Central States on which Simplot relied. Simplot's citation to *Consolidated Freightways Corp. v. Admiral Corp.*, 442 F.2d 56 (7th Cir.1971) is misplaced because in that case the Seventh Circuit found a misrepresentation.

In *Consolidated,* the motor carrier tendered bills of lading marked prepaid to a freight handler for payment. The freight handler in turn tendered the bills of lading to the shipper for payment. Unbeknownst to the shipper, the carrier had not collected payment but instead had extended credit to the freight handler. The freight handler became insolvent and could not pay the carrier. The carrier then sued the shipper for its freight charges. *Consolidated,* 442 F.2d at 58–60.

In finding the carrier estopped from recovering its freight charges, the Seventh Circuit held that by marking its bills of lading as prepaid, the carrier was misrepresenting to the shipper that it had received payment for its freight charges. The court found that the shipper had relied upon those bills of lading in paying the freight handler. Since the shipper had no way to protect itself from the freight handler's conversions, the court estopped the carrier from bringing the collection action. *Consolidated,* 442 F.2d at 60.

In our situation, we do not find Central States' continuing to do business with PSA, alone, to be a misrepresentation sufficient for estoppel. Since Central States made no misrepresentation to Simplot, we will not estop Central from collecting its rates.

## DAMAGES

Simplot argues for a reduction in Central States' $249,962.55 damage claim by an amount corresponding to any charges for repositioning empty trailers. Simplot contends it never agreed to pay for this service. This is a question of fact which we resolve in favor of Central States.

As we noted above in our findings of fact, a portion of the amount PSA charged Simplot for door-to-door service included repositioning by motor carriers of the empty trailers. We therefore find Simplot liable for the full amount of those charges which total $249,962.55.

## PREJUDGMENT INTEREST

■ Central States asserts it is entitled to prejudgment interest from the date of each shipment until the date the judgment is paid because it has not had use of the money to which it was entitled. Simplot contends that prejudgment interest is not appropriate in this instance because courts should award it only to prevent a party from using the litigation process as a means to coerce credit based upon the time value of money. Since it had already paid the shipping charges to PSA, Simplot concludes it has not coerced Central States by forcing it to sue for payment.

■ Prejudgment interest is a form of compensation and the decision to award it rests in the sound discretion of the court. *Michaels v. Michaels,* 767 F.2d 1185, 1204 (7th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986). The decision to award prejudgment interest requires a balancing of the equities between the parties under the circumstances of the case. *Michaels,* 767 F.2d at 1204. The *Michaels'* rule applies in the context of disputes arising from the shipment of goods in interstate commerce by common carriers. *Co-Operative Shippers, Inc. v. Atchison, T., and S.F. Ry. Co.,* 840 F.2d 447 (7th Cir.1988) (Seventh Circuit denied shipper prejudgment interest because the common carrier had not had the use of monies which were awarded to the shipper); *Inman Freight Systems, Inc. v. Boise Cascade Corp.,* 691 F.Supp. 146 (N.D.Ill.1988) (award of prejudgment interest was found appropriate because the

common carrier waited seven years, between provision of services and court's decision, to be paid for undercharges), *aff'd on other grounds,* 881 F.2d 475 (7th Cir. 1989).

In our case, it would be inequitable to charge Simplot with prejudgment interest. Simplot derived no time value from the money withheld by PSA from Central States, and thereby has not used the litigation process as a means to coerce credit from Central States. Moreover, we find Simplot, prior to our decision, had no notice of any law in this district which would have required it to pay Central States' shipping charges. We therefore deny Central States' request for prejudgment interest.

## CONCLUSION

Based upon the above findings of fact and conclusions of law, we enter judgment in favor of Central States in the amount of $249,962.55. Central States is not entitled to prejudgment interest but is entitled to its costs as the prevailing party pursuant to Rule 54(d).